371 So.2d 1135 (1979)
STATE of Louisiana
v.
Calvin Roy SHEPPARD.
No. 63537.
Supreme Court of Louisiana.
May 21, 1979.
*1137 Gordon J. Hamner, Charles Gary Blaize, Houma, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Norval J. Rhodes, Dist. Atty., William G. Yates, Asst. Dist. Atty., for plaintiff-appellee.
DIXON, Justice.
This prosecution arose from a series of arguments among residents of an apartment complex in Houma, Louisiana on July 3, 1977. The initial dispute was between Cheryl Williams and Jerry Simmons, who was living with Melvina Williams, Cheryl's mother. Cheryl then told her boyfriend, Lionel Sheppard, about the altercation, and Lionel subsequently went to the Williams' apartment to discuss the matter with Simmons. After the argument became heated, Lionel went back to his apartment and returned with a pistol which he fired at the ground near Jerry Simmons' feet as they stood in the complex's parking lot. Simmons then called the police and his brothers to relate the incident.
The police questioned Lionel Sheppard but left without making any arrests. After their departure, conditions in the parking lot appeared to return to normal, and Simmons and his brothers stayed in the parking lot to talk and joke. At this point, Calvin Sheppard, Lionel Sheppard's sixteen year old brother, walked through the parking area within a few feet of Simmons and his friends. After an exchange of words, Calvin Sheppard produced a pistol and shot Jerry Simmons. Simmons was pronounced dead at 1:55 p. m. at Terrebonne General Hospital.
Calvin Sheppard was originally charged with second degree murder but was later indicted on July 8, 1977 for first degree murder. After a three day trial he was convicted of manslaughter on March 15, 1978. On March 31, 1978 he was sentenced to fifteen years in the custody of the Department of Corrections. On appeal the defendant relies on fourteen of fifteen assignments of error filed below.
Assignments of Error Nos. 1, 2, 13, 14 and 15
By these assignments of error it is argued that the trial court was in error to permit the State to try and sentence the defendant, a sixteen year old at the time of the offense, as an adult. The defense alleges that trial in the district court violated the Louisiana Constitution and impinged on the rights secured to the defendant by the Fourteenth and Eighth Amendments to the United States Constitution.[1]
The defense contends that R.S. 13:1570(A)(5) violates Article 5, § 19 of the Louisiana Constitution. In essence, the defense argues that the 1974 Constitution prevents the district court from retaining jurisdiction over a juvenile charged with a capital offense or attempted rape once a responsive verdict is returned, and that the legislature's attempt to circumvent this prohibition in R.S. 13:1570(A)(5) is therefore without effect.
Article 5, § 19 provides:
"Except for a person fifteen years of age or older who is alleged to have committed a capital offense or attempted aggravated *1138 rape, the determination of guilt or innocence, the detention, and the custody of a person who is alleged to have committed a crime prior to his seventeenth birthday shall be exclusively pursuant to special juvenile procedures which shall be provided by law. However, by law enacted by two-thirds of the elected members of each house, the legislature may (1) lower the maximum ages of persons to whom juvenile procedures would apply and (2) establish a procedure by which the court of original jurisdiction may waive such special juvenile procedures in order that adult procedures would apply in individual cases."
R.S. 13:1570(A)(5) provides:
"Except as otherwise provided herein, the court shall have exclusive original jurisdiction in proceedings:
A. Concerning any child whose domicile is within the parish or who is found within the parish:
. . . . .
(5) Who violates any law or ordinance, except a child who, after having become fifteen years of age, is charged with having committed a capital crime, or a crime defined by any law defining attempted aggravated rape; provided that once such a child has been actually charged with a capital crime, armed robbery, or attempted aggravated rape, the district court shall retain jurisdiction over his case, even though the child pleads guilty to, or is convicted of, a lesser included offense; and a plea to, or conviction of a lesser included offense shall not revest the juvenile court with jurisdiction of such a child."
An examination of the applicable provisions is convincing that they do not conflict and indeed are quite consistent. By granting the district court jurisdiction over older juveniles alleged to have committed a capital offense or an attempted aggravated rape, the drafters of the Constitution intended that their trials conform in all ways to trials of adults conducted in the district courts. No language in the Constitution suggests a different interpretation. One procedural ramification of trial in the district court is the availability of the responsive verdict system. We therefore find no merit in the argument that Article 5, § 19 precludes the district court from exercising jurisdiction if a responsive verdict is returned in a capital case.
In State ex rel. Moore v. Warden, 308 So.2d 749 (La.1975), we considered whether the district court retained jurisdiction over a juvenile charged with first degree murder to accept a guilty plea to second degree murder. In deciding that the district court lacked this jurisdiction we noted:
"The uniform jurisprudence of the State since 1921 holds that the jurisdiction of the district courts is limited to the determination of guilt and punishment for capital crimes (and the constitutionally provided for attempted aggravated rape). Although it can be argued that the constitutional deposit of jurisdiction in the district courts of the trial of juveniles in capital cases is the grant of jurisdiction embracing every part of the case, from arraignment to sentence, we decline to make such a departure from established jurisprudence, particularly in view of the policy of the State that juveniles are not to be punished as adults, except as provided by the constitution." 308 So.2d at 752.
However, by Act 337 of 1975, the legislature added § (5) to R.S. 13:1570(A) clearly with the object of changing the rule of State ex rel. Moore v. Warden, supra, and the older jurisprudence. It is therefore evident that the district court retains jurisdiction when the juvenile either pleads guilty to or is convicted of a lesser included offense.
The argument that the statute in question deprives the defendant of the equal protection of the laws is equally unpersuasive. The defense contends that such a deprivation arises because Sheppard, convicted of manslaughter, was treated as an adult without resort to the transfer procedures established in R.S. 13:1571.1 et seq., the prescribed method for transferring a *1139 juvenile to the district court if he is not charged with a capital offense or attempted aggravated rape. However, as we noted in State ex rel. Davis v. Criminal District Court, 368 So.2d 1092 (La.1979): "The uniform jurisprudence and the clear intent of the constitutional language is that adult procedures may be employed without waiver proceedings only in a valid capital or attempted aggravated rape prosecution." 368 So.2d at 1094. (Emphasis added). Moreover, an obvious difference exists between Sheppard's position and that of a juvenile prosecuted for manslaughter; Sheppard was prosecuted for a capital offense and was convicted of manslaughter when the jury returned a responsive verdict. The legislature should certainly be permitted to distinguish between the juveniles charged with capital offenses and those charged only with serious felonies; such a distinction is neither arbitrary nor unreasonable.
In addition, the defendant argues that his Eighth Amendment rights were violated because his fifteen year sentence is much longer than any sentence which could have been imposed on him if he had been tried as a juvenile. If Sheppard had been tried in juvenile proceedings, the longest sentence he could have received would have been confinement until his twenty-first birthday, a period of about three years at the time he was sentenced. This contention is merely an extension of the defendant's argument that he was denied equal protection by being tried as an adult and therefore presents no ground for relief.
These assignments of error are without merit.
Assignments of Error Nos. 3, 4, 5, 6 and 11
By these assignments the defense argues that error was committed by the trial judge in denying the motion to suppress the defendant's confession and its fruits and in allowing its introduction at trial.
At the suppression hearing, Officer Aristle Scott of the Houma City Police stated that he advised Sheppard of his Miranda rights when he arrested him at his home. Scott asked the defendant whether he wanted an attorney, but Sheppard did not respond. He was then taken to the police station booking room where Officer Price advised him of his rights a few minutes later. At some point during the interrogation in the booking room, Scott asked the defendant where the gun was and the defendant told him that he had given it to his cousin, Clarence Sneeze. Officer Scott then went to Sneeze's residence to secure the pistol and took no further part in questioning Sheppard.
Officer John Price of the Houma City Police testified that he arrived at the police station on the day in question and found the defendant in the booking room. After advising him of his rights, he called in Calvin's mother from the hallway because he always tried to have parents present when he questioned juveniles; Calvin's father, however, remained in the hallway. After Mrs. Sheppard gave the officers permission to interrogate her son, Officer Scott read the defendant his rights and asked where the pistol was. Price then ushered the defendant and both his parents into the detective bureau and read Sheppard his rights from a form. He then received affirmative answers from Sheppard's parents to his questions concerning their ability to read and understand English, and was told by both parents that he could speak to their son. At that point the defendant stated that he wanted to explain the afternoon's incidents. Price read the defendant the Miranda form and the attached waiver, and Calvin and his parents signed the waiver. Calvin then made a statement in which he declared that he had argued with Simmons and had been walking away from a confrontation when the victim fired a shot at him which in turn caused him to fire a shot in the victim's direction. The statement was reduced to writing and was signed by the defendant and his mother after Price read it to them. Price then persuaded Sheppard to initial each sentence of the statement.
*1140 Both officers stated that the defendant appeared to understand the rights read to him and did not appear unduly nervous or frightened when questioned. They also were adamant that the statement was not secured as a result of threats, promises or other inducements.
The testimony given by the defendant and his parents greatly differs from that of the police officers. Mrs. Sheppard testified at the hearing that no one ever sought her permission to speak to Calvin and that no one advised him of his constitutional rights in her presence. She admitted signing Calvin's statement but said she did so without understanding what it meant. Moreover, she stated that the police officer interrogating Calvin persuaded them to sign the statement and only afterwards read it to them. Mrs. Sheppard denied having signed the waiver form but admitted that her signature appeared on it.
Mr. Sheppard testified that the police were already interrogating his son when he arrived at the station, and that he saw the police obtain his wife's signature on a piece of paper. He denied having signed anything, but stated that he recognized his signature on the waiver form. He also testified that he did not understand the rights read to his son.
Calvin Sheppard admitted that his rights were read to him before he was questioned, but denied understanding them. He also supported his parents' assertions that he gave the statement before they entered the room. Although he freely admitted signing the statement, he testified that at the time he believed the statement to be a "deal" with the prosecution which would release him to his parents. On cross, the defendant admitted having been previously arrested and having been picked up for questioning a number of times, but specifically denied having been read his rights during any of these brushes with the law.
In the instant case, the defendant confessed on July 3, 1977 and was tried in March, 1978, prior to our decision in State in the Interest of Dino, 359 So.2d 586 (La. 1978), which was handed down on June 15, 1978. Therefore, the more stringent safeguards articulated in Dino for the admissibility of a juvenile's confession are not applicable to this prosecution, and the admissibility of Sheppard's confession is to be determined by the totality of the circumstances surrounding it. State v. Collum, 365 So.2d 1272 (La.1978). In Collum, this court articulated the standard for the proper application of this test:
"Proper application of the totality of circumstances test requires that the State sustain the burden of affirmatively proving that the waiver of rights was made freely and voluntarily, with understanding of the consequences which might flow from such a waiver. La.Rev. Stat. 15:451; State v. Hills, 354 So.2d 186 (La.1977). Age of the defendant is a factor which requires this Court to give closer scrutiny to the confession of a juvenile than would ordinarily be required of an adult confession. State v. Sylvester, 298 So.2d 807 (La.1974).
There is no litany of factors to be considered in applying the test. Each case is to be judged on all of the facts and circumstances in that particular situation.. . ." 365 So.2d at 1278.
In its reasons for denying the motion to suppress, the district court noted that Calvin Sheppard had finished the fourth grade and had been transferred to a school for slow learners. School records reveal that Sheppard was tested as having an I.Q. of 47 in 1967, but that he had an I.Q. of 68 when tested in the next year. Records also indicate that Sheppard reads on a fifth grade level. His parents, who ostensibly were there to advise him, completed only one or two grades of school. Nevertheless, the trial judge considered the defendant not "as ignorant as he would like to picture" himself to be, and noted that Calvin was at the time working in a federal jobs program and had been able to complete the necessary forms to apply for the program.
A review of the record demonstrates that the trial judge did not err in admitting the confession. The defendant spoke in *1141 complete sentences and gave rational and coherent testimony. He also indicated that he knew from past experience that he was being questioned with regard to charges against him and admitted that he was advised of his rights a number of times. The police took numerous precautions to be sure that Calvin understood the implication of his actions before he spoke. His refusal to speak when he was first questioned by Officer Scott suggests that he was aware of his right to remain silent while under interrogation. In fact, the defendant remained silent until his parents were with him, at which time they apparently permitted the police to interrogate their son and expressed their own curiosity over the events in question. Officer Price stated that Sheppard himself wished to explain what had happened. It is also noteworthy that the defendant adhered to the substance of his statement when he testified in his own behalf at trial. These factors indicate a voluntary and knowing waiver of the defendant's constitutional rights.
These assignments are without merit.
Assignments of Error Nos. 7, 8 and 9
The defendant contends that the trial court was in error to permit the State to refer to events involving the victim and the defendant's brother, but which did not involve the defendant himself. The first assignment was taken when the prosecutor referred in his opening statement to the argument between Simmons and Lionel Sheppard which ended in Lionel Sheppard's firing a shot at Simmons' feet. Although the defense argued that this incident was separate from the charges against the defendant, the trial court overruled the defense objection when the prosecutor explained the relationship between the earlier incident and the fatal shooting of Simmons by Calvin Sheppard. The defense subsequently objected when testimony was later elicited concerning the first shooting incident.
It is clear from the record that the first shooting incident was a direct cause of the criminal conduct with which Calvin Sheppard is charged, since his shooting Simmons resulted from the series of arguments which occurred at the apartment complex on the day in question. Therefore, the opening remarks and subsequent testimony concerning the first incident were admissible as part of the res gestae. R.S. 15:447, 448; State v. Taylor, 363 So.2d 699 (La. 1978); State v. Brown, 340 So.2d 1306 (La. 1976).
The defense has relied on the cases of State v. Perry, 16 La.Ann. 444 (1862) and State v. Laque, 41 La.Ann. 1070, 6 So. 787 (1889) for the proposition that threats made by a third party against the victim are not admissible against the defendant. However, both cases clearly indicate that this rule is inapplicable if the threats by the third party form part of the res gestae of the charged offense. Therefore, the trial court was correct to permit the opening remarks and testimony on this point.
These assignments are without merit.
Assignment of Error No. 10
The defense argues by this assignment of error that the trial court erred in overruling a defense objection to hearsay testimony given by the victim's brother, Jesse Simmons. While testifying concerning incidents leading up to the crime, Simmons stated that he drove to the scene with his little sister:
"Q Now, let's back up just a little bit. When you first arrived at the Circle, and located your brothers, did you talk to your brother, Jerry? (the victim).
A Yeah, I said a few words to him.
Q O.k., and what about your little sister, did she stay in the car during the whole time?
A No, she didn't. At the time when I talked to Jerry, the few words that I said, I said, `Man, don't take my little sister out here; Man, I heard there's been some shooting.' I said, `Man, you known Mama, she don't want her out here.' And he said, `Aw, Man, go head, go head.'
MR. HAMNER:
Objection, Your Honor.

*1142 MR. YATES:
Your Honor, I realize this is hearsay, but I think that it's exceptional hearsay. I think it will go to prove the state of mind of the decedent at the time, and I would ask for an exception to the hearsay rule at this time.
THE COURT:
It's not the decedent, as I remember correctly, talking to him.
MR. YATES:
Well, he was getting ready to relate some words related to him by the deceased.
MR. HAMNER:
I don't see the relevancy, Your Honor, with the decedent, at this time.
THE COURT:
I think it would be important. I'll permit the question, I'll permit it to be answered.
MR. HAMNER:
We object for the record.
THE COURT:
Let the objection be noted.
BY MR. YATES:
Q What did your brother tell you?
A My brother told me, he said, `Aw man, that's all right.'
Q O.k., and was he angry or anything at that time?
A No, he was laughing.
Q Did he take your little sister?
A Sure, he pulled her right out the window and went over by my brother and he went back to talking."
Hearsay is an out of court assertion introduced to prove the truth of its content. State v. Weedon, 342 So.2d 642 (La.1977). Hearsay is generally inadmissible because of its historic unreliability and because of the unfairness to the defendant who cannot test the truth of the statement. State v. Thompson, 331 So.2d 848 (La.1976). One traditional exception to the rule, however, involves out of court declarations introduced to prove the state of mind of the declarant. 6 Wigmore on Evidence, §§ 1714 et seq. (Chadbourn Rev. 1976); McCormick on Evidence, §§ 294-296 (2d ed. 1972); State v. Weedon, supra. The hearsay in question indicated that the victim had no intention of continuing the altercation or of starting a new one since he was not concerned about his little sister's safety. The victim's state of mind was highly relevant in the instant case because the defense was contending that Calvin Sheppard acted in self-defense. Therefore, the trial court was not in error to permit his testimony.
This assignment of error is without merit.
Under Article 920(2) of the Code of Criminal Procedure, this court may review errors which are discoverable from a mere inspection of the pleadings and proceedings without inspection of the evidence. In State v. Jones, 341 So.2d 3 (La.1976), we held that the failure to delay sentencing for at least twenty-four hours after a motion for a new trial was denied. C.Cr.P. 873, was an error patent which the court could raise on its own motion. The same standard of review should apply if the statutory delay is ignored after a denial of a motion in arrest of judgment, since the applicable delay is governed by the same code article.
In the present case the defendant was brought before the court for sentencing on March 31, 1978. The minutes reflect that the court heard argument on the motion in arrest of judgment and subsequently denied it. Defense counsel then moved for a delay in sentencing, but the trial court denied the motion and sentenced the defendant to fifteen years. It is therefore clear that the trial judge failed to observed the delay required by Article 873. Moreover, the reasons given by the trial judge for the imposed sentence[2] appear insufficient in light of the requirements of *1143 Article 894.1 of the Code of Criminal Procedure.
For the reasons assigned, the conviction of Calvin Sheppard is affirmed, but his sentence is vacated and the case is remanded to the district court for resentencing in accordance with Articles 873 and 894.1 of the Code of Criminal Procedure.
CALOGERO, J., dissents.
TATE, J., dissents and assigns reasons.
TATE, Justice, dissenting.
The issue is whether a juvenile may be sentenced to imprisonment in an adult institution because the state overcharges him with a capital offense of which he is acquitted (although convicted of a lesser offense by a permitted responsive verdict).
The defendant, a 16-year-old boy, became involved in an argument with neighbors in a housing project in July, 1977. He shot one of the participants and killed him. There is no question of his guilt of the offense.
The homicide could not be characterized as a first-degree murder, a capital offense, because of the absence of any statutory aggravating circumstance. La.R.S. 14:30 (1976), 14:30.1 (1977), State v. Payton, 361 So.2d 866 (1978). The jury, in fact, convicted the defendant of manslaughter. La.R.S. 14:31 (1973).
Under our state constitution, juveniles charged with manslaughter (a non-capital offense) are within the exclusive jurisdiction of the juvenile court, La.Const. of 1974, Art. 5, Section 19; unless, prior to trial, formal transfer proceedings permit the trial of the juvenile in adult court, after hearing and under strict judicial supervision of the propriety of the transfer. La.R.S. 13:1571.1 (1975) et seq. (No such formal transfer proceedings were ever here initiated.) Unless so formally transferred, the juvenile when found guilty of commission of the offense is punishable only in juvenile correctional institutions, not in an adult penitentiary.
Here, the majority would permit this 16-year-old boy to be sentenced to the adult penitentiary upon conviction of manslaughter, despite a constitutional provision intended to keep juveniles out of the adult criminal justice system for non-capital crimes, in the absence of formal transfer proceedings designed to assure judicial supervision that this particular juvenile should be tried and punished as an adult because of his past record and because he is not amenable to treatment or rehabilitation. No such transfer proceedings have here been held.
This juvenile is punishable in an adult penitentiary for no reason other than that the state over-charged him with a capital offense, when his conduct at maximum was a violation of a non-capital crime, either second-degree murder, La.R.S. 14:30.1, or manslaughter, La.R.S. 14:31.
The majority errs in holding that the elaborate constitutional and legislative (transfer) provisions to protect juveniles against prosecution and punishment as adults can be circumvented by the simple expedient of intentionally overcharging this juvenile defendant of a capital crime when there is no factual justification for doing so. The majority thus permits the state to decide unilaterally (through the grand jury) unfettered by due process considerations, that the juvenile, if convicted of a non-capital lesser offense, will serve his sentence as an adult offender in an adult institution rather than in an appropriate juvenile institution.
Article 5, Section 19 of the Louisiana Constitution of 1974 provides for exclusive juvenile jurisdiction of persons "alleged to have committed a crime prior to his seventeenth birthday . . ." except for persons fifteen years of age or older "alleged to have committed a capital offense or attempted aggravated rape . . . ."
The majority holds that under this constitutional provision the district court jurisdiction over the juvenile defendant, obtained when the juvenile was charged with first degree murder, is retained after the juvenile is convicted of a lesser, non-capital offense.
*1144 The jurisprudence of this state interpreting Article 7, Sections 52, 96 of the 1921 Constitution (the predecessors to the present Article 5, Section 19), dating back to this court's decision in State v. Dabon, 162 La. 1075, 111 So. 461 (1927) and continuing uninterrupted through State ex rel. Moore v. Warden, 308 So.2d 749 (La.1975),
makes it clear that there is a constitutional protection for juveniles which allows district court jurisdiction for older juveniles only in those cases in which the juvenile is actually convicted of a capital crime. See also, State v. Bedford, 193 La. 104, 190 So. 347 (La.1939); State v. West, 173 La. 974, 139 So. 304 (1932).
The majority's unsupported statement that "[b]y granting the district court jurisdiction over older juveniles alleged to have committed a capital offense or an attempted aggravated rape, the drafters of the constitution intended that their trials conform in all ways to trials of adults conducted in the district courts," is, I think, much too facile a dismissal of our long-standing constitutional protection of juveniles. Under the 1921 constitution, the district courts had jurisdiction to try juveniles charged with capital crimes, just as the 1974 provision permits; the real issue is whether, if acquitted of the capital offense, the juvenile may nevertheless be punished as an adult. As long ago stated by Chief Justice O'Niell in State v. Dabon, 162 La. 1075, 1082, 111 So. 461, 463 (1927):
"When a child under the age of 17 years is indicted for murder, the case is one in which only a jury of 12 in the criminal district court can decide whether a felonious homicide was committed, and, if so, whether it was murder or manslaughter, but when the jury decides that the crime was not murder but manslaughter, the verdict means, and is, in effect, that the child was indicted for a crime which the child did not commit. The main object and purpose in the establishment of juvenile courts was not merely to have a different form of procedure for the trial of juvenile offenders, but to deal with them as wards of the state, to be kept apart from the demoralizing influence of hardened criminals, and to be reformed and redeemed, not degraded and ruined. It would be paying attention more to the forms of procedure than to the object and purpose of the law to say that, because this child was indicted for the crime of murder, which she did not commit, she should be finally dealt with and punished as a felon, whereas, if she had been properly accused of the crime which she did commit, she should be dealt with not as a felon but only as a ward of the state, not to be made an example of but to be reformed and redeemed." (Italics mine.)
The central inquiry is not, as the majority states, whether the language of the 1974 constitution suggests that the intention of the framers was to leave our constitutional interpretation intact, but whether there is any manifestation of an intention to change this court's interpretation of the constitutional language. There is no such manifestation in the debates of the constitution. In fact, the language of the debates indicates that there was no intention to change the existing jurisprudence on this point.[1]
*1145 The constitutional provision granting adult criminal courts jurisdiction to try juveniles charged with capital offenses must be interpreted in the light of its constitutional intent to protect juveniles from punishment as adults, unless convicted of the capital offenseif acquitted of the capital offense, by this verdict the juvenile became subject to punishment only as a juvenile. This was the long-settled constitutional import of the 1921 constitutional provision, which was not intended to be changed by the 1974 constitution.
The constitutional protection for juveniles contemplated, under the settled meaning attached to the provision, that a responsive verdict of a non-capital effect had the effect of transferring the juvenile back to the juvenile system, since the non-capital crime of which convicted was never intended by the constitution to be tried in adult court or to subject the offending juvenile to punishment in an adult penitentiary.
The majority relies on the amendment of La.R.S. 13:1570(A)(5) by Act 337 of 1975 as justifying retention of jurisdiction by the adult correctional system, when the juvenile charged with a capital offense is convicted of a lesser offense. The legislature was, of course, without the power to lessen by statute the constitutional protection of juveniles against adult punishment for manslaughter.[2]
Of course, if a specific juvenile is bad enough to entitle the state to transfer him (after court determination), then the transfer provisions, La.R.S. 13:1571.1 (Supp. 1978), permits such transfer under strict judicial scrutiny. These transfer procedures are constitutionally authorized by Art. 5, Section 19.
It makes absolutely no constitutional sense to hold that the constitutional protections against trial and punishment of juveniles as criminals may be circumvented at the whim of the prosecutor charging ("alleging") commission of a capital offense. The constitutional words that the jurisdiction of the district court attaches when the capital crime is "alleged" does not necessarily mean that it continues, if in fact the juvenile is not guilty of the capital offense which permits adult punishment.
In the present case, for instance, the juvenile was originally charged with second degree murder. He was indicted for first degree murder (permitting the adult trial instead of the juvenile trial protections), but the jury convicted him only of manslaughter. Under the facts, the juvenile was obviously over-charged. Even assuming it was an intentional murder, there was no first degree murder because there was no aggravating circumstances involved that justify such a charge. At most, it was second degree murder, and even then the jury convicted only of manslaughter in this apartment complex argument between teenage neighbors.
No functional purpose is served to put juveniles into adult penitentiaries simply because the state chooses to indict a juvenile for a capital offense which he did not commit and as to which no evidence supports his conviction of the capital degree of the crime, when our state constitution contemplates that the juvenile guilty of manslaughter should instead be processed *1146 through the juvenile instead of the adult correctional system.
NOTES
[1] The defense alleges a deprivation of Sixth Amendment rights, but this argument is not development in brief.
[2] When he imposed sentence, the trial judge stated:

"The Court has considered very carefully this matter, the fact that a young man is dead as a result of the actions of this young man. This is a very serious matter. The Court has considered many other elements in this sentence.
I sentence this young man to serve fifteen (15) years with the Department of Corrections. This is the judgment of this Court. Thank you."
[1] The present language in Article V, Section 19 began with Delegate Proposal 43 of the Constitutional Convention, which spoke in terms of crimes "committed" by older juveniles. See Verbatim Transcript of the Constitutional Convention, State of Louisiana, Vol. XXXVI, 112th Day's Proceedings, p. 65.

The delegate who authored the proposal explained the language as "[maintaining] the present provisions regarding juveniles or youngsters fifteen years or older who commit vicious or heinous crimes and allow that these persons be tried in the district court as the present 1921 constitution provides for and which has notand I repeatit has not been changed." [Emphasis supplied.] Transcript, Vol. XXXVI, 112th Day's Proceedings, p. 65.
The debates over this delegate proposal centered on language which many delegates feared would require the establishment of separate juvenile courts in those parishes which at the time had none, and on differing views as to whether the jurisdiction of the juvenile courts should be defined in the constitution at all. Verbatim Transcript, Vol. XXXVI, 112th Day's Proceedings, pp. 65-103.
This delegate proposal did not pass in its original form, but by amendment, in response to the opposition stated above, was changed to its present form. See Official Transcript, Vol. XXXVIII, 118th Day's Proceedings, pp. 62-74. It was by this later amendment that the word "alleged" was added. The intention in adding this word was not to change the then-existing interpretation of the constitution to provide jurisdiction to be in district courts for responsive verdicts to capital offenses, but was a stylistic change designed to assure that the jurisdiction of the district court for convictions for capital crimes is established at the outset of the prosecution (provided there is subsequently a conviction for the capital crime charged).
[2] The juvenile could not under the constitution be tried and punished as an adult for manslaughter, without formal transfer proceedings prior to trial, with hearing and adjudication before an impartial judgeas contrasted with a virtually ex parte determination by a prosecutor to evade the constitutional restriction of trial and punishment in adult courts of juveniles charged with a non-capital homicide, by simply over-charging the juvenile with a non-existent capital offense.