529 So.2d 14 (1988)
STATE of Louisiana
v.
Douglas A. DiLOSA.
No. 88-KA-16.
Court of Appeal of Louisiana, Fifth Circuit.
May 16, 1988.
Rehearing Denied July 15, 1988.
*15 Oestreicher, Whalen & Hackett, Ralph S. Whalen, Jr., New Orleans, for appellant.
John M. Mamoulides, Dist. Atty., Johnny Lee, Eric Honig, Dorothy A. Pendergast, Asst. Dist. Attys. (Louise Korns, of counsel), Gretna, for appellee.
Before CHEHARDY, C.J., and GAUDIN and WICKER, JJ.
CHEHARDY, Chief Judge.
Douglas A. DiLosa appeals his conviction by a jury of the second-degree murder of *16 his wife, Glinda Whitmore DiLosa, for which he received the mandatory sentence of life imprisonment without benefit of probation, parole or suspension of sentence, under LSA-R.S. 14:30.1. The defendant has raised six assignments of error, the most significant of which challenges the sufficiency of the evidence.
The State's case against him consisted entirely of circumstantial evidence. As if making a jigsaw puzzle or a mosaic, the State had to fit together bits and pieces of evidence to make the picture wholecontradictions and inconsistencies between the defendant's version of various events, the physical evidence presented by the State, and witnesses' hearsay statements relating remarks made to them by the murdered woman or by the defendant.
The jury found the evidence sufficient to convince them the defendant was guilty. Our primary aim on this appeal is to determine whether that evidence is legally sufficient to establish the defendant's guilt beyond a reasonable doubt.

FACTS
At approximately 5:30 a.m. on September 27, 1986, police responded to an Emergency 911 telephone call regarding a burglary at Apartment 7-C, Chardonnay Village Condominiums, 1500 West Esplanade Avenue in Kenner, Louisiana. They found Douglas DiLosa lying on the floor of his living room with his wrists and ankles bound. They found his wife in the bed upstairs in the master bedroom, strangled to death, with her wrists, ankles and neck bound. Glinda DiLosa had been covered with the bedsheet up to the neck and the bedroom door was locked, requiring the officers to kick in the door so they could enter. Every room in the house except the children's bedroom had been ransacked. A window pane in the living room had been taped over with duct tape and removed with a glass cutter, although that window was in a lowered position when police arrived. Both the front door and the back door were locked when police arrived.
Douglas DiLosa related to police that he had been awakened at about 3:30 that morning by noises from downstairs. When he went down to investigate, he was set upon by two intruders, who beat and kicked him until he was unconscious. When he later awoke, he found himself bound at the wrists and ankles. He called for his wife, then for his son. His seven-year-old son came downstairs and found him and, at DiLosa's instruction, called the police.
The police and medical help arrived promptly. Following examination by emergency medical technicians, Douglas DiLosa was taken by ambulance to a nearby hospital. While being treated in the emergency room, he was informed of his wife's death. After several hours he was discharged at his own request. He then went to police headquarters, where he was questioned and gave a voluntary statement. Four days later, at the investigating officer's request, DiLosa gave a second voluntary statement.
Following several months of investigation, Kenner police arrested Douglas DiLosa on December 29, 1986. His arrest was prompted by physical evidence that cast doubt on his version of events, together with the facts that he had been unemployed for a long time and that his wife was covered by a large amount of insurance.
On January 15, 1987, DiLosa was charged by grand jury indictment with second degree murder. After a seven-day trial in July 1987, the jury rendered a unanimous verdict finding the defendant guilty as charged. Following denial of his motion for new trial and his sentencing on September 11, 1987, the defendant took this appeal.

ASSIGNMENT OF ERROR NO. 1
The defendant asserts the trial court erred in allowing on numerous occasions the admission of hearsay statements purportedly made by the victim, Glinda DiLosa.
The State called Nancy Rossi, a friend and co-worker of the victim, to testify to statements made by Glinda reflecting worry *17 over the DiLosas' financial status and fear there would be a foreclosure of the mortgage on the condominium. The defense objected on the basis of hearsay, but the objection was overruled on the ground that the testimony was an exception to the hearsay rule because it went to the state of mind of the victim.
Hearsay evidence is either testimony or written evidence of an out-of-court statement offered to prove the truth of the matter, its value resting on the credibility of the out-of-court declarant. State v. Martin, 356 So.2d 1370 (La.1978). Such evidence generally is inadmissible because of its historic unreliability and because of the unfairness to the defendant, who cannot cross-examine the declarant to test the truth of the statement. State v. Thompson, 331 So.2d 848 (La.1976).
One general exception to this rule involves out-of-court declarations introduced to prove the state of mind of the declarant. State v. Sheppard, 371 So.2d 1135 (La. 1979).
"When an out-of-court statement is offered to prove circumstantially the declarant's state of mind, it is non-hearsay. It is admitted in evidence, not to prove the truth of the facts recited, but to prove that the utterance occurred as a basis for inference. * * *"
State v. Raymond, 258 La. 1, 245 So.2d 335, 340 (1971).
Conduct or declarations of the decedent shortly before his killing may sometimes be admissible as tending to show the immediately antecedent circumstances explanatory of the killing and connecting the accused with it. State v. Weedon, 342 So. 2d 642 (La.1977).
However, hearsay evidence showing the victim's state of mind for the purpose of proving the motive of the defendant is inadmissible, since its prejudicial effect on the defendant far outweighs its probative value as to the victim's state of mind. State v. Weedon, supra. Hearsay evidence of motive is inadmissible under our state jurisprudence. See State v. Doze, 384 So. 2d 351 (La.1980).
In the instant case, the prosecution theorized that the defendant decided to kill his wife for her life insurance because he was unhappy in his marriage, he was unemployed, the mortgage on the condominium was due to be paid in full in a few months, and the family might face foreclosure if they could not make the balloon payment.
Under this theory, it is plain the prosecution used the hearsay statements made by Nancy Rossi more to provide evidence of a motive than to prove the victim's state of mind. Accordingly, the testimony relating Glinda's statements regarding her finances and foreclosure of the mortgage was inadmissible.
The standard for reviewing the erroneous admission of evidence is whether there is a reasonable possibility that the constitutional error complained of might have contributed to the conviction. Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. Id.; State v. Gibson, 391 So.2d 421 (La.1980).
For the reasons set forth under our discussion of Assignment of Error No. 6, infra, we find the error to be harmless under the standard set forth in Chapman and Gibson.

ASSIGNMENT OF ERROR NO. 2
The defendant asserts the court erred in allowing hearsay statements purportedly made by the defendant, Douglas DiLosa, which he contends were irrelevant and highly prejudicial.
Like the first assignment of error, this assignment presents a question of admissibility related to the hearsay rule. Jeff Rossi, a witness for the State, testified over objection by the defense that the defendant had expressed resentment toward women who compete with men in the job market. The defendant avers such testimony is irrelevant and highly prejudicial hearsay and should not have been admitted.
*18 As stated above, one exception to the hearsay rule is an out-of-court declaration introduced to prove the state of mind of the declarant. State v. Sheppard, supra. In addition, state-of-mind evidence is admissible only if the particular person's state of mind that is being shown is itself at issue or is relevant to prove a fact at issue. State v. Martin, supra.
The defense argues that a statement showing defendant's state of mind toward women in his field of employment is irrelevant and has no probative value as to his state of mind regarding his wife, so that admitting the evidence had an obvious inflammatory effect on the jury.
The prosecution's theory was that the defendant, discouraged by the loss of his job and the end of his unemployment benefits, resorted to murdering his wife for her life insurance proceeds. Under these circumstances the evidence seems relevant to show the defendant's state of mind regarding his employment situation and his finances.
The defendant argues that, even assuming the evidence was admissible under the state-of-mind exception to the hearsay rule, it should have been excluded because of its highly prejudicial nature.
Circumstantial evidence, even though logically relevant, should be excluded "if its probative value is outweighed by the risk that its admission will cosume too much time, unnecessarily confuse the jury concerning the issues to be determined, tend to excite the emotions of the jury to the undue prejudice of the opponent, or unfairly surprise the opponent." State v. Porretto, 468 So.2d 1142, 1148 (La.1985). In Porretto, evidence of a witness' homosexual lifestyle was introduced to discredit him.
The testimony at issue before us does not present such a highly prejudicial circumstance that would excite the emotions of the jury against the defendant. We find no merit to this assignment.

ASSIGNMENT OF ERROR NO. 3
The defendant contends the court erred in permitting the prosecution to make references to the defendant's failure to take the stand.
During closing argument the prosecutor made the following statement:
"Ladies and gentlemen, there was an eye witness to this case that the State could not call. There's a person who knew, who killed Glenda DiLosa and watched the whole thing and was there while it happened. And that's Glenda DiLosa. Right now Glenda DiLosa is crying from her grave to you to see that justice is done, to see thatasking you to make sure that the person who got away with this does not continue to get away with it. * * *"
The defendant avers this is an impermissible comment on his failure to take the stand. The defense objected and requested an admonition to the jury, but made no motion for a mistrial. The trial judge overruled the objection and refused the admonition, stating, "It's obvious that the statement of the prosecutor was directed to the victim and not to the defendant and the objection is denied."
LSA-C.Cr.P. art. 770 provides that, upon motion of a defendant, a mistrial shall be ordered when a remark or comment made within the hearing of the jury by the district attorney refers directly or indirectly to the defendant's failure to testify in his own defense. If the defendant only requests that an admonition be given, however, the court shall admonish the jury to disregard the remark but shall not declare a mistrial.
Because the defendant did not move for a mistrial, his only relief would have been an admonition to the jury to disregard the remark if the judge had concluded the remark was impermissible.
The defendant points to the use of a comma by the court reporter in transcribing the phrase, "There's a person who knew, [emphasis added] who killed Glenda DiLosa and watched the whole thing and was there when it happened." The defendant argues the comma makes it abundantly *19 clear that the reference to the defendant's failure to take the stand was intended to draw the jury's attention to that fact. He asserts this punctuation establishes that the prosecutor was not referring to the victim but to someone who killed the victim.
We defer, however, to the discretion of the trial judge, who himself heard the disputed remark. He felt the remark clearly referred only to the victim. No reference to the defendant was made; the prosecutor only mentioned that the victim knew what happened. The record does not indicate that the prosecutor intended the focus of the argument to be the defendant's failure to take the stand. Accordingly, this assignment is without merit.

ASSIGNMENT OF ERROR NO. 4
In this assignment the defendant contends the court erred in permitting the prosecutor to urge the jury to go beyond the evidence in making the decision.
In his rebuttal argument the prosecutor made the following remarks:
"[Y]ou saw all the attempts the State made to try to get out other items from all these other witnesses, the same way Mr. Fanning suggests, Barbara Jollier, Barbara Warren, Tom Cox, Nancy Rossi, Jeff Rossi, Nina Herbert, all of these people, you heard questions I asked them, but things just couldn't workjust weren't admissible. We tried our best to try and get all the information out but the jury's not allowed to hear everything."
The defense objected at this point, but requested neither a mistrial nor an admonishment. In response to the defense objection, the court stated, "It's rebuttal, but I don't want to go any further than we've gone with it already."
The prosecutor resumed his argument and made the following statement, to which a second defense objection was made: "Now, imagine for yourself what's going on between the defendant and his wife that we're not privy to in this trial." This time the court maintained the objection and instructed the prosecutor to confine his argument to the evidence admitted. The defense moved for a mistrial, which was denied.
It is clear from the record that the defendant made the motion for a mistrial as an afterthought, to protect the record. His objections to the argument were timely, however, and thus preserved a review of the merits. State v. Johnson, 506 So.2d 643 (La.App. 4 Cir.1987), writ denied, 508 So.2d 818.
Because the objections were maintained and the prosecutor was admonished by the court, the issue then becomes whether the remarks were sufficiently prejudicial to require a mistrial.
LSA-C.Cr.P. art. 774 requires that the State's rebuttal be confined to answering the argument of the defendant. In the first part of the objectionable argument, the State was answering the defense's argument that questions could not be asked of the witnesses regarding the defendant's love for his wife because the State would have objected to such evidence as inadmissible. The prosecutor pointed out to the jury that some of the evidence the State would have liked the jury to consider would have been inadmissible just as some evidence for the defense may have been inadmissible. We find that portion of the argument to be within the scope of Article 774. See State v. Bailey, 470 So.2d 342 (La.App. 5 Cir.1985).
The second part of the argument calls for conjecture on the part of the jury; therefore, it goes beyond the scope of permissible rebuttal argument. Before reversing a jury verdict because of a prosecutor's closing remarks, however, the appellate court must be convinced the objectionable statements were so inflammatory or prejudicial that they influenced or contributed to the guilty verdict. State v. Horton, 476 So.2d 9 (La.App. 5 Cir.1985), writ denied, 478 So.2d 144 (La.1985).
These remarks do not mandate a mistrial under Article 770. LSA-C.Cr.P. art. 771 provides that where the district attorney has made a remark that is "irrelevant *20 or immaterial and of such a nature that it might create prejudice against the defendant * * * in the mind of the jury," on request of the defendant the court shall admonish the jury to disregard the remark. If the court is satisfied the admonition is not sufficient to assure the defendant a fair trial, the court may grant a mistrial.
The defendant, it should be noted, did not request an admonition, as required by this article. His request was for a mistrial. A mistrial is a drastic remedy, warranted only when the admonition is not sufficient to assure fairness. See State v. Johnson, supra.
The defendant argues that because the jury requested additional instructions on what evidence could be considered, it is clear that the remark created prejudice, in that the jury obviously became confused.
Our review of the transcript convinces us, however, that the jury's action indicates they were careful to consider only the proper evidence in deciding the guilt or innocence of the defendant. The jury was properly instructed and they took their responsibility as jurors seriously enough to ask for instructions. We conclude that any prejudicial effect of the prosecutor's statement was not severe enough to warrant a mistrial. Accordingly, this assignment is without merit.

ASSIGNMENT OF ERROR NO. 5
The defendant asserts the court erred in admitting the tape-recorded statement of the defendant made by witness Ralph Britt, when neither notice nor discovery of that statement had been provided to the defense.
In this assignment the defendant challenges the court's ruling permitting the State to use a tape-recorded statement given by the defendant to a general adjuster from Amex Life Insurance Company, who was investigating the defendant's claim for the proceeds of a $100,000 life insurance policy on his wife.
The witness, Ralph Britt, was called to the stand and the State prepared to play the tape recording for the jury. Defense counsel objected he had had no notice of this statement, despite his request for all recorded statements, made during discovery. The prosecutor responded that they had just learned of it themselves.
At this point the court recessed to allow defense counsel time to hear the tape. When the trial resumed, defense counsel asked for time to prepare a cross-examination. The court granted the request, postponing Britt's testimony until the next day.
When Britt was recalled the next day, the State again attempted to introduce the tape. The defense objected on the ground it was an inculpatory statement and notice pursuant to LSA-C.Cr.P. art. 768 had not been given. The State contended that the statement was not inculpatory and that its existence had been discovered only the night before jury selection. The court denied the objection, based on a ruling that the statement was not inculpatory.
The defendant argues the statement was inculpatory because it was used by the State to show inconsistencies in the defendant's story.
LSA-C.Cr.P. art. 768 provides,
"Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence."
This court stated in State v. Cathey, 493 So.2d 842, 851 (La.App. 5 Cir.1986), writ denied, 500 So.2d 419, cert. denied, Cathey v. Louisiana, ___ U.S. ___, 107 S.Ct. 2181, 95 L.Ed.2d 838 (1987),
"The purpose of the notice requirement of C.Cr.P. art. 768 is to prevent surprise and allow adequate time for the preparation of a defense. Reversal is not mandated when the defendant does not show that he was prejudiced by the State's failure to provide written notice. * * * If a defendant merely asserts that he was `surprised,' but offers nothing to show how he would have prepared for *21 trial differently, a reversal is not warranted. * * *"
A confession admits the commission of a crime, while an inculpatory statement, as used in C.Cr.P. art. 768, refers to the out-of-court admission of incriminating facts made by a defendant after the crime has been committed. State v. Quimby, 419 So.2d 951 (La.1982). An incriminating statement is one that admits a fact tending to establish guilt, or from which guilt may be inferred. State v. Bodley, 394 So.2d 584 (La.1981).
In the case before us, the defendant made no statements of fact in his interview with Ralph Britt that establish any element of the crime of murder in and by themselves. The taped interview with the insurance adjuster was not damaging until it was compared with other statements made by the defendant, when inconsistencies between the statements became apparent.
Absent a showing either of bad faith by the State in failing to inform the defense of the statement during pretrial discovery, or of substantial prejudice to the defendant, the ruling of the trial court will be affirmed. See State v. Shelton, 490 So.2d 515 (La.App. 4 Cir.1986). Accordingly, we find this assignment is without merit.

ASSIGNMENT OF ERROR NO. 6
In his final assignment of error, the defendant asserts the evidence was insufficient as a matter of law to sustain a conviction.
He contends that the State, whose case was built on circumstantial evidence, failed to exclude every reasonable hypothesis of innocence as required by LSA-R.S. 15:438 and, therefore, the conviction must be reversed.
In assessing the sufficiency of the evidence to support a conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979). Where circumstantial evidence is used to prove the commission of the offense, R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."
The requirement of R.S. 15:438 does not establish a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt. State v. Captville, 448 So.2d 676 (La.1984).
"When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. * * *" Id., at 680.
Without considering the hearsay evidence found inadmissible hereinabove, the evidence presented by the State established the following facts.
On the date of the murder, Douglas and Glinda DiLosa had been married for almost nine years and had two children, a seven-year-old boy and a five-year-old girl. The DiLosas had purchased the condominium at Chardonnay Village several years earlier and had used it as rental property until June 1986, when they moved from their home on Indiana Street in Kenner to the condominium.
Douglas DiLosa had been unemployed since September 1985, when he was laid off by McDermott, Inc. He had worked for McDermott as a personnel manager for more than five years, during which time he had been stationed by the company in several foreign countries. He was earning $30,000 annually when he was laid off.
After his job ended, DiLosa received unemployment compensation benefits of approximately $800 per month until his benefit rights expired in August 1986, about a month before his wife was murdered.
While Douglas was employed by McDermott, Glinda DiLosa had worked part-time *22 as a real estate agent for Latter & Blum. In April or May after her husband's job ended, she began working a second part-time job, as a receptionist for Essex Mortgage Company. In July 1986 she became a full-time employee of Essex, earning $11,500 annually.
The DiLosas had owned both the house on Indiana Street, with a mortgage note in excess of $600 per month, and the condominium, with a mortgage note in excess of $800 per month. After moving from Indiana Street, the DiLosas had rented that house to a tenant for approximately $900 a month. At the time of the murder, the DiLosas had a contract to sell the house to the tenant dependent on approval of a mortgage loan to the prospective purchaser.
On the night of Friday, September 26, 1986, Glinda DiLosa babysat for Dr. John Neary, a neighbor in the condominium complex. She returned from the babysitting job between 12:45 a.m. and 1:00 a.m. on Saturday, September 27th. Dr. Neary watched as she walked from his apartment to the patio of hers. He saw a man waiting for her at the gate whom he assumed was her husband. These facts correspond with the information given by the defendant in his statements to police.
At approximately 5:30 a.m. that morning, the DiLosas' seven-year-old son telephoned police to report that his father was tied up. When three police officers arrived a few minutes later, the boy unlocked the front door for them. Finding the house in total darkness except for a light on the patio, the officers used flashlights to search the house. The living room appeared to have been ransacked.
Douglas DiLosa, clad in clean white T-shirt and briefs, was lying on the living room floor, moaning and whimpering. His hands were behind his back, bound at the wrists with quarter-inch white cotton rope. The binding consisted of a single strand of the rope, passed separately around each wrist with a half-hitch or "granny" knot and with a five- to six-inch length of rope connecting the wrists, like handcuffs. His ankles were tied in the same manner.
On the sofa near the living room window overlooking the patio lay a pane of glass cut from the center light of the window, taped heavily on one side with gray duct tape. All the windows in the house were double windows, consisting of an inner window with a single large pane of glass on each sash and an outer window with six small panes of glass on each sash. The inner window was down on all the windows in the house except the window from which the pane had been cut and the window immediately adjacent thereto. On those the inner windows were completely raised but the outer windows were completely lowered.
The officers went upstairs, where they found two bedrooms. In the room closest to the stairs, the door of which was ajar, they saw the DiLosas' five-year-old daughter sleeping. The door of the other bedroom was closed and locked; to open it the officers kicked it in. The noise awoke the sleeping child, who began screaming.
They found Glinda DiLosa lying face-down in the bed, covered to her neck with a sheet. She had been strangled and tied with the same kind of rope as was on her husband. She had rope knotted around her neck; her wrists were behind her back; her wrists and ankles were bound in the same fashion as her husband's. There was a small amount of blood on the bed in the area of her face. She had been dead long enough for rigor mortis to begin to set in, evidenced by the stiffness of her jaw. The police summoned a medical emergency unit.
The officers who arrived on the scene thereafter to conduct the investigation noticed that there were no footprints in the dew on the grass outside the condominium and no marks of trampling on the carpet inside. The front and back doors of the residence were locked. The back door was a sliding glass patio door, with a slide-up latch. The venetian blinds over the patio door were lowered and their louvers closed, although one of the officers subsequently raised them to look out at the patio.
In the small patio/garden area outside the rear door police found a partially-used *23 roll of 3M Brand gray duct tape, set atop two large overturned buckets near the living room window; a glass-cutting tool; a disc-shaped paper label for a roll of 3M Brand duct tape; and, near the label, several scraps of clear cellophane, of the type commonly used as "shrink-wrap" on commercial products, which police assumed was the wrapper for the roll of duct tape.
Although some valuables were later determined to be missing (such as Glinda's jewelry, her small camera, some money), several expensive items in plain view were still in the residence, such as a Canon camera, two large ivory tusks, some figurines, and televisions. The rope on DiLosa and his wife matched a rope used to tie the patio gate closed. DiLosa said in a later statement that he had bought the rope some time before for a boat tarpaulin. He had, in addition, several rolls of duct tape in the house.
Melanie Autin, an emergency medical technician, was the first to examine DiLosa on the scene. She found DiLosa conscious and talking when she arrived. Using a penlight to examine him, she found no apparent abrasions around his face and no lumps or bleeding on his head. He complained of pain in the left arm and she could see some swelling and discoloration on his left forearm. He said his ribs hurt but recoiled from her examination, saying it hurt too much. His lung sounds were all clear; his legs, feet and ankles were all normal; his pupils were fine. There was no sign of bleeding. His blood pressure was acceptable, pulse a little quick, nothing to indicate he was in shock. Considering that he was very upset and he was crying, Autin said, his vital signs were not out of line.
He told her he had been jumped from behind, beaten and kicked. She noticed that his T-shirt was very white and very clean. In checking his wrists and ankles for abrasions, she found she was able to fit three fingers between the rope and the skin on DiLosa's right ankle. She did not attempt this on the other ankle or on the wrists. She found no abrasions near the ropes. The ropes were not tight enough to cut off circulation or to leave marks.
On the scene DiLosa told the other paramedic, Darryl Wood, that he had been unconscious until his son shook him on the shoulder and woke him up. Later, when being transported to the hospital, he told Wood that he had come downstairs to investigate a noise about 3:30 a.m., that a light was flashed in his face and he was struck on the head by a heavy blow, then hit and kicked until he fell down unconscious, and that he remained unconscious until he woke up and started hollering.
Wood said DiLosa wanted his children to come with him in the ambulance when he left for the hospital. DiLosa asked about his wife two or three times. He was not told she was dead, but instead was informed that another team of paramedics was taking care of her. DiLosa did not suggest that the children go with their mother. Ultimately DiLosa's brother was requested to come get the children from the scene.
At the hospital DiLosa gave Detective Dwayne Babin a description of the alleged intruders. He stated they were two black males. He described one as in his 20's, five feet ten inches tall, 140 pounds, thin build, clad in dark clothing, with a blue-and-white bandanna concealing his face up to his nose, dark sunglasses, a cloth headband with something that extended down the side of his face and an earring in his left ear. The second he described as in his 20's, five feet ten inches tall, heavier build, 170 pounds, medium to muscular build, also clad in dark clothing, with a stocking mask concealing his face. DiLosa said the one wearing the bandanna called the one with the stocking mask "Rudy."
Detective Richard Mottley also interviewed DiLosa at the hospital. DiLosa told him he heard a noise from downstairs, went downstairs, and when he reached the bottom he was jumped on by two men and beaten. He said he was hit over the head and his sides with some type of object. He described the perpetrators as Negro males wearing dark clothing. One had on dark sunglasses, a bandanna tied around his *24 mouth covering the lower part of his face, and a bandanna tied around his head. The other one had a white stocking over his head. DiLosa told Mottley that while the one with the bandanna was beating him up, the one with the stocking mask called out, "Rudy, come on, we gotta go upstairs."
Despite the detailed descriptions of the attackers given to police, in the statement he gave later to Ralph Britt DiLosa said the room was so dark he could not tell if the police were uniformed or not. DiLosa also said in that statement that after his son came down and he told the child to call police, the boy told him the back door was open. DiLosa said he told the boy to close and lock the door.
He also told Britt his son had gone upstairs to check on his sister and mother and that the boy had reported to him that his sister was sleeping but that he couldn't wake his mother up. DiLosa did not indicate that the boy made any mention of the locked bedroom door. The defendant did not mention these things to police, who had found the doors closed and locked. He did not mention anything about the boy lowering the blinds, which were lowered when the police arrived.
Detective Mottley stated that when DiLosa was told of his wife's death by the emergency room physician, DiLosa cried briefly before being sedated by the doctor. Mottley also stated that when DiLosa cried "his eyes were not red." Mottley admitted, however, that he was standing about 30 feet away, in the hall outside the room in which DiLosa was being treated.
Dr. Drew Dwyer, who treated DiLosa at the emergency room, testified that X-rays and CAT scans of DiLosa were normal. He did have abrasions on his forehead and bruises on his rib cage. The doctor stated it was possible these could have been self-inflicted with a stick (found in the house near where DiLosa lay) without too much pain, given DiLosa's statement that he had taken a painkilling medication (Percodan) six hours earlier. Dr. Dwyer found no significant redness in the area of the ropes on DiLosa's wrists and ankles.
Dr. Dwyer testified it was highly unusual for a person to be unconscious for two to three hours, as DiLosa would have been if his version of events were true, particularly if no concussion or other brain injury had occurred.
Dr. Richard Patterson, an expert in neurology, testified that the CAT scan and other tests administered to DiLosa showed no injuries that would cause unconsciousness and that there was no evidence of significant head injuries. Dr. Patterson stated that if a person were unconscious due to trauma or shock more than a few minutes, there would be some organic evidence of brain damage due to decreased levels of respiration and blood flow. Further, Dr. Patterson said, such an extended period of unconsciousness would cause a person to be disoriented, confused and unable to give a lucid account such as was given by the defendant to the paramedics and police at the scene.
Detective Douglas Dodt, who was in charge of the DiLosa investigation, stated that DiLosa told him that after Glinda had arrived home from her babysitting, they had a drink, took a bath together and then went to bed, where they had sexual relations before going to sleep. DiLosa also told Detective Dodt he had been vasectomized. Tests performed by the criminalistic lab revealed the presence of semen in Glinda DiLosa but no sperm, confirming the defendant's statement and establishing that the victim was not raped.
Dr. Alvaro Hunt, the forensic pathologist who performed the autopsy on Glinda DiLosa, stated there was no evidence of sexual trauma; that she had been forcefully strangled, indicated by the amount of bruising and abrasions under the rope on her neck and the pinpoint hemorrhaging on her face; that there was otherwise no evidence of a struggle, in that the ropes on her wrists and ankles left no bruising or contusions on the skin, indicating they were applied after she was dead or while she was in an agonal state.
Deputy Merryl Boling, the latent fingerprint examiner, stated that although many prints were found in the house, only two *25 could be identified. Both of these were the defendant's. One was a palm print on the sliding glass patio door; the other was a fingerprint on a piece of the cellophane found on the patio near the duct tape label. Other tests by the criminalistics laboratory determined that all hairs preserved from the scene by investigators were Caucasian head hairs; no Negro hairs were found. None of the hairs could be identified more definitely.
Various neighbors who lived near the DiLosa condominium and who had been up at various times during the night testified they had seen and heard nothing unusual. Chris Regal, who lived in a condominium adjoining one side of the DiLosa residence, stated she had fallen asleep on her patio about 12:30 or 1:00 a.m.; she had awakened some time later, perhaps as much as two hours, because she developed a cramp, and had gone indoors. She heard nothing unusual.
Similarly, Linda Billingsley, who lived in the condominium on the other side of the DiLosa residence, testified she heard no unusual sounds that night. David Wohlleben heard nothing unusual, although his bedroom wall adjoins the wall of the DiLosa kitchen. Martin Cusanza and Robert Murphy, who lived nearby, had peered outside several times during the night and seen nothing out of the ordinary. None of the neighbors had heard the police arriving, either, however, nor the sound of the door being kicked in, or the noise of the daughter's hysterics.
Every room in the DiLosa home was ransacked, as mentioned above, except the children's room, which appeared untouched. Even the kitchen and bathroom cabinets had been rummaged through, with such things as flour canisters opened and emptied. Items from drawers and cabinets throughout the house were strewn in piles on the floors, most as if thrown haphazardly. However, Detective Dodt noticed that in one room, a tray holding spools of thread was placed on the floor with the spools still upright and in place; similarly, he noticed the telephone receiver in the answering machine still in its cradle, as if placed rather than thrown there.
Detective Dodt also learned there were several policies on Mrs. DiLosa's life: a group plan through her employer in the amount of $46,000; a policy through Life of Georgia for $50,000 with an additional $50,000 in accidental death benefits; and the $100,000 Amex policy. The defendant told him they had taken out the Amex insurance to replace the McDermott group insurance. At another time defendant told him they had taken out the insurance because Glinda was "the breadwinner." Dodt also learned that the condominium had been purchased under a five-year balloon note, on which the principal balance (in excess of $80,000) would be due in March 1987.
DiLosa had requested Britt not to mention the amounts of the life insurance to any other family members he might interview.
The application for the Amex policy was shown at trial to Barbara Warren, Glinda DiLosa's supervisor at Essex Mortgage Company, who stated she had seen Glinda's signature thousands of times at work and that she did not recognize the signature on it as Glinda's. Curiously, when Douglas DiLosa was asked by Ralph Britt during their interview to identify the signatures on the application, he stated they looked like his and Glinda's signatures but that he was "not an expert."
Warren and two other witnesses testified they had seen or spoken to Glinda during the week before her death and had expressed concern to her, asking her what was wrong, to which she had been unresponsive. (The judge upheld defense objections, refusing to allow the witnesses to testify otherwise as to their impressions of the deceased's mood or emotions.)
The defense presented evidence that, despite the defendant's unemployment, the DiLosas' financial situation was not desperate. They had over $6,000 in their bank account, the payments on their mortgages were current, and the sale of the Indiana Street property was pending. There was no evidence of any serious marital problems, *26 no evidence the defendant had ever struck or harmed his wife, no evidence that he ever had any extramarital affairs. The items the defendant reported stolen from the house were never located.
Ronald Singer, the director of the Jefferson Parish criminalistics laboratory, demonstrated for the jury that he was easily able to tie himself up as the defendant and the victim were bound. Another technician testified he also had been able to tie himself up in that manner.
The defendant did not take the stand. His version of events was set forth in his statements to police, to medical personnel who treated him, and to Ralph Britt. He told Britt that when they lived on Indiana Street they had been burglarized several times and that on several other occasion two black males had attempted to break into the house while it was occupied. He theorized this event was a similar incident. Alternatively, he stated that the previous tenants of the condominium were thought by the DiLosas to be sellers of illegal drugs and, therefore, the intruders the night of the murder may have been looking for narcotics. He also stated that the previous tenants, after being evicted by the DiLosas, had threatened Glinda's life.
Dr. George McCormick, a forensic pathologist who is coroner of Caddo Parish, testified as an expert witness on behalf of the defendant. His opinions were based on examination of the photographs taken by police. He disagreed with Dr. Patterson's opinion that the defendant could not have been unconscious for two hours without brain damage.
Dr. McCormick stated that the bruises on defendant's ribs could not have been caused by a stick, although the defendant, in his second statement to Detective Dodt, had stated that as the perpetrators were beating him he grabbed the "sti," "whatever it was they were beating [him] with," an object "like a billy club." (A wooden dowel or broomstick, approximately two feet long, had been found lying near the defendant where he was tied up. The defendant had told Detective Dodt that he and his wife used it as a security measure to block the sliding glass door from opening.)
DiLosa also presented testimony of Raymond Bollinger, a former officer in the United States Coast Guard who was accepted by the court as an expert in knots and cordage. Bollinger testified he did not believe the defendant could have tied himself up because, he stated, one cannot tie oneself so tight as to be unable to untie oneself. (There was no evidence, however, to indicate that the defendant in fact ever attempted to untie himself; the only evidence was that he asked his young son to try to cut the ropes.)
Dr. Carlos Pisarello, an expert in neurology, testified for the defense that if defendant had drunk an alcoholic beverage and taken Percodan before going to bed, those could have caused a lengthy period of unconsciousness, such as the defendant claimed to have had, if he had suffered head trauma. (Unexplained was the question of how defendant could have awakened so easily at the sound of intruders if he had consumed the alcohol-Percodan combination.)
Daniel Denoux, an assistant to defense counsel, testified that he had gone to the condominium on a recent night and had walked through the dew on the grass in the common area behind the DiLosa residence, to see if his footprints would be visible in the dew. He stated that the footprints did not remain visible for more than 20 minutes.
The degree of credibility to be attached to the testimony of witnesses, including experts, is wholly the province of the jury. It is obvious, from the jury's verdict, that they found the prosecution witnesses more convincing than those of the defense. The jury concluded that the State's case excluded every reasonable hypothesis of innocence.
Considering the evidence as a whole, we are unable to find the jury erred. Viewed in its entirety and in the light most favorable to the prosecution, the evidence is sufficient to establish Douglas DiLosa's guilt beyond a reasonable doubt. Even ignoring any evidence of motive, such as *27 the insurance policies, we conclude that the physical evidence alone must convict Douglas DiLosa. The evidence simply does not support the defendant's version of events.
For the foregoing reasons, therefore, the defendant's conviction is affirmed.
AFFIRMED.