342 So.2d 642 (1977)
STATE of Louisiana, Appellee,
v.
Charles WEEDON, Appellant.
No. 58501.
Supreme Court of Louisiana.
January 24, 1977.
Rehearing Denied March 3, 1977.
*643 Jack Peebles, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Abbott J. Reeves, Director, Research and Appeals Division, Metairie, for plaintiff-appellee.
TATE, Justice.
The defendant Weedon was charged with the murder of his wife, Charlene. La.R.S. 14:30.1. The jury found him guilty of manslaughter, La.R.S. 14:31, a responsive verdict. He appeals his conviction and 21-year sentence.
Weedon relies upon two principal specifications of error: (1) The admission of allegedly incriminatory information obtained from him during booking procedures, despite an understanding of the police officers with the defendant's attorneys that he was not to be interrogated as to the crime outside of their presence; (2) The admission of unreliable hearsay testimony from three of the deceased wife's friends of her intention to separate from her husband.
The defendant is entitled to reversal if there is merit in either specification. The state's case for the apparently motiveless killing of his wife by the defendant businessman depended entirely upon inferences from circumstantial evidence.[1] Any evidence tending to prove an admission or motive on his part could not be harmless under the circumstances shown.

Facts
On Tuesday, September 9, the sheriff's office received a telephoned request from Weedon's attorneys to meet them at the Weedon home. Two detectives went there, and, with permission of Weedon and his attorneys, searched his home and an automobile parked there.
In the trunk of the vehicle they found the body of Weedon's wife. Subsequent medical examination showed that she had been *644 killed by two shots to the head and had been dead for from 36 to 48 hours. The state's theory is that she was killed in her home on the morning of Sunday, September 7.
The detectives then arrested Weedon and read him his Miranda rights. These require (if not waived) the presence of counsel at any custodial interrogation. Weedon was crying, red in the face, and obviously emotionally disturbed at the time.
In accordance with the specific information given to Weedon that he had a right to have his attorney present with him during any questioning, his lawyers then specifically instructed the detectives in Weedon's presence that he was not to be questioned "with any aspect of the investigation" (in the detective's words).
The detectives then asked the lawyers if Weedon could answer questions for the arrest register.[2] The detective fully admitted that, when the attorneys gave them permission to have Weedon complete the arrest register, they were also instructed not to question him about anything pertaining to the crime. Their own testimony indicates agreement with the attorneys that Weedon would complete only data on the arrest register pertaining to personal data.[3]
Relying upon this agreement, the attorneys did not accompany Weedon down to the station for booking. We may say, at this point, that Weedon was also entitled to rely upon the indicated advice of his attorneys that he could without prejudice to himself answer questions in order to complete his arrest register at the time of his booking.

(1)
Despite this agreement, the booking officer, a homicide detective, did not restrict his questioning of the accused to the personal information requested for the "arrestee data"(name, age, etc.). He also asked Weedon for certain information on another portion of the form, entitled "offense data". He secured from the defendant information as to the date and time of the offense, completed by the officer as: "7 September" and "10:00 A.M. Sunday" respectively.[4]
Over strenuous objection, the state introduced testimony of this booking procedure as an admission by the defendant that he had killed his wife at 10:00 A.M. in the morning two days before the booking.
The state contends that the booking statement, taken in violation of the agreement with Weedon's attorneys, is nevertheless admissible because: (1) it was voluntarily made; (2) the homicide detective (allegedly) had not been informed of the limited interrogation to be permitted without *645 the accused's attorneys present; and (3) a voluntary election to waive Miranda rights resulted from the circumstance that the booking detective had ascertained from Weedon that the latter had retained attorneys and had been informed he did not have to talk without their presence.
As stated in Miranda v. Arizona, 348 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966): "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, Provided the waiver is made voluntarily, knowingly and intelligently." (Italics ours.)
Under the circumstances shown, there was no knowing waiver by the accused of his right to presence of counsel and of his right against self-incrimination. He answered questions asked by him at his booking in reliance upon his attorneys' advice. This advice was properly based upon the assurance by state officers that Weedon would only be asked to furnish the usual personal data at the time of booking("name, rank, and serial number", as the attorney stated).
The accused's constitutional rights against self-incrimination and to the effective assistance of counsel cannot be prejudiced by the state's failure to honor its agreement not to question the accused about the crime unless his attorneys are present. The claimed ignorance by one state officer of the agreement by other state officers cannot convert into an intelligent and knowing waiver uncounselled responses of the accused made by him perfunctorily as a result of the agreement that he would be asked only non-incriminatory statements.
The extremely prejudicial admission was unconstitutionally obtained. It was reversible error to admit it over the defendant's objection.
In State v. Jackson, 303 So.2d 734 (La.1974), we similarly reversed a conviction where, by misleading an accused as to the availability of counsel, damaging statements were obtained from her. We noted, 303 So.2d 737: "The essential reasons for the constitutional right of access to counsel lie in principles of fundamental fairness safeguarding the rights of an individual against potential governmental abuse, as well as in protecting the integrity of the truth-finding process * * *."
As noted by Miranda v. Arizona, 384 U.S. 436, 466, 86 S.Ct. 1602, 1623-4, 16 L.Ed.2d 694 (1966): "That counsel is present when statements are taken from an individual during interrogation obviously enhances the integrity of the fact-finding processes in court. The presence of an attorney, and the warnings delivered to the individual, enable the defendant under otherwise compelling circumstances to tell his story without fear, effectively, and in a way that eliminates the evils in the interrogation process."
The Louisiana constitution expressly protects the rights of an arrested person to be advised of his right to remain silent and of his right to the assistance of counsel, Louisiana Constitution of 1974, Article 1, Section 13. We hold that, due to state action, the accused was involuntarily induced to make the alleged admission secured by the booking sergeant and that this admission was taken in violation of his cited rights accorded him by our state constitution.[5]
The conviction must be reversed.

(2)
Nevertheless, since the issue may arise in a retrial, we must also pass upon another specification of erroneous admission of evidence.
To prove motive in this otherwise unexplained killing of Charlene Weedon, the *646 state called three friends of hers to testify as to marital discord, including a short separation some three months before the killing. No objection to this general testimony was made.
However, over defense objection, the state elicited from three friends that, on three different occasions, Charlene had told them that she intended to leave Weedon again.
The defense objection was that these declarations by the decedent were hearsay. Hearsay is an out of court assertion introduced to prove the truth of its content; as such, it is inadmissible, with certain exceptions, because of its historic unreliability and unfairness to an accused in that he cannot test the truth of the unsworn out of court declaration. State v. Thompson, 331 So.2d 848 (La.1976).
Admitting that motive cannot be proved by hearsay, the state nevertheless contends that these out-of-court declarations were admissible to prove the existing state of mind of the declarant, a traditional exception to the hearsay rule. 6 Wigmore on Evidence, Sections 1714 et seq. (Chadbourn rev., 1976); 4 Weinstein's Evidence, Section 803 (1976); McCormick on Evidence, Sections 294-296 (2d ed. 1972). This exception includes within its scope such declarations to do an act, introduced to prove that the declarant subsequently did the act. Wigmore, Section 1725; Weinstein, Section 803(3)(04); McCormick, Section 295.
Upon this principle, two leading American decisions permitted admission of hearsay to prove that, shortly before his death, a decedent intended to go with a certain person (now suspected of killing him), a fact otherwise unproved by the evidence. Mutual Life Insurance Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); People v. Alcalde, 24 Cal.2d 177, 148 P.2d 627 (1944). In each instance, the ultimate fact sought to be proved was that, if the victim had carried out his intention, them it was possible that the suspected person had killed the victim because then the suspect was near the victim at the time of his death.
Commentators have suggested that, under, such circumstances, the reliability of the hearsay is decreased, because it involves not only an inference that the declarant carried out his intention but also that the declarant's hearsay-identified companion (i.e., the suspect) had also carried out an intention proved only by another's hearsay declaration. McCormick, pp.698-99; Weinstein, p. 803-104. The effect of the admission of the hearsay is not only to prove that the declarant acted on his intention,[6] but also that a nondeclarant likewise completed an intent ascribed to him by the out-of-court declarant upon some unknown basis.
Our leading Louisiana decision to the same effect is State v. Raymond, 258 La. 1, 245 So.2d 335 (1971). There, the victim's out-of court declaration of revulsion to his suspected killer (because of the latter's homosexual advances) was admitted as nonhearsay circumstantial evidence of the victim's state of mind concerning the suspect, with whom the victim rode off shortly afterwards, never again to be seen alive. Professor Pugh has noted that the decision is questionable, since the relevant issue was the accused's not the victim's state of mind. 32 La.L.Rev. 353-55 (1972).
Essentially, if justifiable, admission of the out-of-court declaration of the victim (who by reason of his death cannot testify) in Raymond is based upon the expedient rule sometimes relied upon in homicide cases that "conduct or declarations of the decedent shortly before his killing may sometimes be admissible as tending to show the immediately antecedent circumstances explanatory of the killing and connecting the accused with it." State v. Raymond, 245 So.2d 342 (concurring opinion).
Even under this principle, however, the hearsay declarations by the deceased wife are inadmissible in the present case.
*647 Two of them, made three and five weeks before the wife's death, plainly do not fall within the Raymond rule. Aside from their inadmissibility as hearsay, the fact sought to be proved by them (that the wife at some date in the past intended to leave her husband, but did not do so) is not probative of her state of mind at the time of her death.[7]
The third declaration presents a more troublesome issue. Here, Karen Armstrong was permitted to testify that the deceased wife had called her at 3:00 P.M. on the afternoon (Saturday) preceding the morning of her presumed death (Sunday). Over objection, the witness was permitted to testify that the wife told her she intended to leave her husband the following morning, after he left on a trip, and would call her at noon to get directions so as to stay with Ms. Armstrong. The witness's testimony is quite positive, however, that the wife did not intend to tell her husband of her intention and that she planned to leave secretly. Tr. 205-06, 210.
The fact that the wife intended to leave her husband is irrelevant, unless her husband knew of her intention. If the wife had told her friend she intended to tell her husband of her intention to leave him the following morning, her out-of-court declaration might have been admissible under Raymond as tending to show immediately antecedent circumstances explanatory of the killing.
Here, however, the wife's declaration was exactly the opposite. Her intention to leave her husband that morning, uncommunicated to him, does not probatively tend to permit an inference of any reaction by her husband to her undisclosed intention.
That is, the hearsay admitted allegedly to prove the wife's state of mind or intention is probative only if we infer (a) that the wife did some act the next morning in accordance with her declared intent or state of mind, (b) evidenced such state of mind or intention to her husband, and (c) the husband reacted to it.
In Raymond, arguably (a) and (b) were implied by the victim's declaration, permitting the jury to infer (c). Here, however, for the trier of fact to infer that the husband reacted to the wife's intention (i. e., the (c) condition), it must also infer that, contrary to her declaration, she communicated to her husband her intention of leaving him (i. e., the (b) condition), a necessary prerequisite for her state of mind to be relevant to an issue in the case.
Accordingly, we find that this third (Armstrong) declaration also is inadmissible. In effect, its introduction attempted to prove a motive for the killing, by hearsay inadmissible for that purpose: That the defendant killed his wife Sunday because she intended to leave him that morning. Admission of hearsay for such purpose is not permitted, because of its historic unreliability.
Since the hearsay was far more probative of motive, prohibited by our jurisprudence, than of the wife's state of mind (assuming the latter, uncommunicated to her husband, to be relevant, cf. 32 La.L.Rev. 355), its prejudicial effect far outweighed its probative value as to the wife's state of mind or intention. The declaration is thus inadmissible on that ground also, insofar as offered to prove the wife's state of mind. Pugh, Louisiana Evidence Law 418-20 (1974).
We find merit in this specification of error also.

Decree
For the reasons assigned, we reverse the conviction and sentence, and we remand for a new trial in accordance with law.
REVERSED AND REMANDED.
SANDERS, C.J., dissented and filed an opinion.
SUMMERS, J., dissented and assigned reasons.
MARCUS, J., dissented.
*648 SANDERS, Chief Justice (dissenting).
As a result of a homicide report, Jefferson Parish officers met with the defendant and his two attorneys on September 9,1975. The officers arrested defendant and advised him of his rights as required by Miranda v. Arizona, 348 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The attorneys instructed the officers, in defendant's presence, that the defendant was not to speak to a law enforcement officer concerning the crime, but that he could be questioned for booking purposes only. The same day, the defendant was brought to Deputy Walter Gorman for booking. Prior to asking defendant any of the questions on the arrest register, Deputy Gorman asked the defendant whether he had been advised of his rights. He responded that he had been so advised and that his attorneys had been present at the time. The deputy then proceeded to ask defendant the questions appearing on the arrest register, one of which was the approximate time of the crime. Defendant supplied this information. The record discloses no suggestion of coercion, intimidation, or even an objection. The booking officer was unaware of the attorneys' instructions.
The majority reverses the conviction on the ground that the booking information relating to the time of the crime was inadmissible. In my opinion, the holding is in conflict with the principles announced in two of our recent decisions: State v. Cotton, La., 341 So.2d 355 (1977); State v. Peevy, La., 321 So.2d 324 (1975). These cases hold that a defendant may waive his right against self-incrimination and to the presence of an attorney, even though he has previously advised law enforcement officers that he does not desire to make a statement.
The case of State v. Jackson, La., 303 So.2d 734 (1974), relied on by the majority, is distinguishable. There, the personnel of the Sheriff's office withheld from the defendant information that her family had retained an attorney and that he had instructed the police not to interrogate her.
The privilege against self-incrimination is personal to the defendant. See Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951); McAlister v. Henkel, 201 U.S. 90, 26 S.Ct. 385, 50 L.Ed. 671 (1906); State v. Wallace, La., 321 So.2d 349 (1975). He may waive it, if he so desires, even contrary to the instructions of his attorney. The defendant may likewise waive the presence of his attorney. In my opinion, the record establishes that defendant's limited waiver was voluntarily, knowingly, and intelligently made. Hence, the statement as to the time of the crime was admissible.
I express no opinion at this time on the hearsay question treated in the majority opinion.
For the reasons assigned, I respectfully dissent.
SUMMERS, Justice, dissenting.
I dissent for the reasons assigned by the Chief Justice.
NOTES
[1] The only non-circumstantial evidence was the testimony of a trustee of the parish prison that the accused had fully admitted to him that he had shot his wife. This trustee, a convict admitting to 21 convictions had on at least two previous occasions procured alleged admissions from fellow prisoners for use in evidence against them in felony trials, in return for which he had received lenient treatment on his own charges for which held. Another occupant of the cell, imprisoned 10 days for a traffic violation but otherwise without criminal record, testified that no such conversations took place and that the prisoners distrusted the trustee, a professional criminal.
[2] In answer to a question "What is the arrest register?", the detective replied: "That is the information about the accused, such as his name and address and his date of birth and his Social Security Number and his driver's license form, and it is a form that is used when a person is charged with a crime."
[3] See interrogation of the detective by defense counsel:

"Q. And when we talked about this, and you asked if you could have his name and birthday and address, what did Mr. Masinter tell you?
"A. He advised us that it was all right as long as it didn't pertain to the actual crime and its investigation.
"Q. Did he also not tell you all that Mr. Weedon could tell you his name, rank and serial number, to coin a phrase, isn't that the phrase he used on that particular morning?
"A. I remember him saying that he could not answer any questions concerning the crime.
"Q. Well, the date and time of the crime pertains to the crime, does it not?
"A. Yes, sir.
"Q. And you understood that we didn't want you asking any questions pertaining to the crime, including the date and time and place, is that correct?
"A. Yes, sir.
"Q. And we specifically told you that we didn't want any questions asked of Mr. Weedon pertaining to any part of the crime, which included the time and date and place, was that your understanding?
"A. Yes, sir."
[4] We do not dwell upon, as immaterial to our holding, a less-incriminatory discrepancy shown between the computerized retrieval of this data and the belatedly discovered original in the homicide detective's handwriting.
[5] We note that the latest federal expression also is in accord that a taking of a statement under less blatant circumstances similarly violates the federal constitution. Williams v. Brewer, 509 F.2d 227 (CA 8, 1974), certiorari granted 423 U.S. 1031, 96 S.Ct. 561, 46 L.Ed.2d 404 (1975).
[6] See Weinstein, p. 803-105: "In the abstract, the proposition that intent is usually acted upon can be shown to be psychologically doubtful."
[7] This conclusion is re-enforced under the present facts, where after the declarations, the wife accompanied her husband to California and returned with him to Louisiana.