562 So.2d 868 (1990)
STATE of Louisiana
v.
George B. BROWN.
No. 89 K 2678.
Supreme Court of Louisiana.
June 4, 1990.
Dissenting Opinion June 15, 1990.
Motion to Accept Application Granted; Rehearing Denied June 28, 1990.
*869 William Guste, Jr., Atty. Gen., Bryan Bush, Dist. Atty., E. Sue Bernie, Janis L. Kile, Asst. Dist. Attys., for State of La., plaintiff-applicant.
Kathleen Stewart Richey, Asst. Public Defender, Kathryn M. Flynn, for George B. Brown, defendant-respondent.
Dissenting Opinion of Justice Dennis June 15, 1990.
COLE, Justice.[*]
In this second degree murder case, the issue is whether the trial court properly allowed the State to introduce an extrajudicial declaration, made by the decedent within 24 to 36 hours of her death, as probative of the decedent's state of mind toward defendant. The declaration revealed decedent's perception of defendant being sexually interested in her and her present state of mind or intent not to have sexual relations with him. It was offered to circumstantially show decedent was not interested in having sexual relations with defendant when other evidence offered at trial showed decedent was sexually permissive; defendant had, on the afternoon preceding decedent's death, announced to friends his "need to have a woman" that night; decedent was last seen voluntarily accompanying the defendant and decedent's body was discovered with her jeans unfastened and pulled down around her hips exposing the upper level of her pubic area.
Defendant, George Bernard "Benny" Brown, was indicted by the East Baton Rouge Parish Grand Jury for the second degree murder of eighteen year old Sheri *870 Lynn Daigle. LSA-R.S. 14:30.1. Brown pled not guilty. After a five day trial, a twelve person jury found him guilty as charged. The trial court then sentenced him to the mandatory term of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. Brown appealed. The Court of Appeal thereafter reversed the conviction and sentence finding the trial court committed reversible error when it allowed the State to elicit from its witness, Michael S. Hood, an unreliable hearsay statement of the decedent. State v. Brown, 549 So.2d 323 (La. App. 1st Cir.1989). While recognizing mental state declarations are an exception to the hearsay rule when introduced to prove the state of mind of the declarant, if the declarant's state of mind is at issue, the appellate court determined the decedent's state of mind was not at issue as no evidence demonstrated decedent communicated her state of mind to Brown. The court therefore concluded the extrajudicial declaration improperly provided evidence of Brown's motive and its admittance was not harmless error. We granted the State's application for review, 558 So.2d 556 (La. 1990), and now reverse and remand.

ARGUMENTS AND EVIDENCE

A. THE STATE'S OPENING STATEMENT
The State made its opening statement to the twelve person jury on March 16, 1988. The jury was informed the State would prove the defendant committed second degree murder on May 6, 1987 of an eighteen year old pregnant female named Sheri Lynn Daigle. The police investigation was outlined, from the fluke discovery of the decedent's body, which had been dropped head first into a septic tank, through all the leads which directly implicated defendant. Emphasizing the isolated and secluded nature of the location where the decedent's body was found, the State informed the jury the evidence would show defendant's intimate knowledge of and familiarity with the crime scene off Seigen Lane. The State described the abandoned house and how it was not visible from Seigen Lane. The fresh trail through very high weeds, located behind the abandoned house, which led directly to the three septic tanks, was also described.
The jury was informed physical and testimonial evidence would place defendant's vehicle at the crime scene during the twenty-four hour period preceding the discovery of the decedent's body, and testimonial evidence would prove defendant was the last person with whom the decedent had been seen. The State further apprised the jury, evidence would establish defendant reacted to the police investigation, first, like a caged animal and, subsequently, by fleeing.
Centrally located within the statement, the State referred to the substance of decedent's contested extrajudicial declaration as follows:
The police continued their investigation trying to track down Sherri's (sic) last movements. They learned that on the afternoon of [Wednesday] May 6, 1987, that Sherri had spent some time in the Spanish Town area ... She had met another young man named Michael Hood, and she stayed in those apartments for a couple of days, and you will hear that on Tuesday night she spent the night with Michael Hood. You will also learn that on Tuesday she had a brief conversation with the defendant. They knew each other. The defendant was interested in a sexual encounter with her. She was not interested in him. And you will learn that Sherri was looking for a place to stay. She couldn't stay indefinetely (sic) over with Michael Hood because his girlfriend from Kansas City was coming in on Wednesday. And you will hear.... (emphasis added).

B. TESTIMONIAL EVIDENCE
The State's first witness, Randy Johnson, testified that at approximately 5:30 p.m. on May 7th, he and Brett Fontenot were searching for wood. Fontenot directed him to an abandoned house at 10443 Seigen Lane. Johnson had lived within a mile of this abandoned property for 19 years, yet stated he had not previously been aware of its existence. The house was not visible *871 from Seigen Lane[1] and a gravel and dirt road led to the house. From the back porch of the house, they saw a fresh trail through the 5½ to 6 foot high weeds[2] and decided to investigate. While walking down the path they saw a puddle of blood.[3] Continuing to the end of the path, they came upon three culverts, one of which had its lid down. They removed that lid and discovered a pair of shoes (moccasins) poking out of the water. Fontenot touched the shoes. The two immediately went to the St. George Fire Department and reported their find. Thereafter, Deputy Sheriff Walker accompanied them back to the abandoned house.
After Deputy Sheriff Walker ascertained a body was in the middle septic tank, he notified the proper investigative units and quadronned off the area to preserve the crime scene. Walker testified he observed a fairly fresh tire track in a rut in the gravel and dirt drive, about 45 yards from the house.[4] He roped this tire track off separately. Chuck Smith, Deputy Coroner of East Baton Rouge Parish, subsequently arrived. He found the septic tanks located about 30 feet beyond the weed line. Like the other witnesses who visited the abandoned property, his testimony affirmed the septic tanks were not visible from the back of the house and the trail leading to the tanks was fresh. The principal investigating officer on the case, Randy Keller, also related his impression of the trail as it was "extremely obvious that whoever placed the body in that culvert had to have prior knowledge that the culvert was there because the path led directly through a wall of grass, directly to the culvert. It didn't wander left. It didn't wander right."[5]
When the body was lifted out of the septic tank, Chuck Smith testified, it was in a state of full rigor mortis.[6] The clothing on the body was identified as the same clothing decedent was last seen wearing. However, the decedent's jeans were found unfastened, unzipped and pulled partially down her hips, exposing the upper level of her pubic area. Large wounds on the top of her head indicated decedent had been beaten with a hard object.
The autopsy showed decedent had received a blow to the chin (about the size of a fist) and had been hit with a blunt object eight times on the back of her head. Although the multiple skull fractures and *872 bleeding of the cerebrum were sufficient to cause her death, her death ultimately was caused by inhalation of the fluids in the septic tank into her lungs.
From a folded piece of paper exhibiting a telephone number, found in the pocket of decedent's jeans, the sheriff's department learned the identity of the body. The telephone number belonged to Ray Doucet, the manager of Prescott Place apartments. He had given decedent his telephone number that day. He and Derrick Fox, the apartment complex's security guard, subsequently identified the body.
From Doucet, the detectives learned decedent recently left her live-in boyfriend, Paul Beatty, who resided at Prescott Place apartments.[7] Investigating further they learned, after decedent moved out of Beatty's apartment, she had not found a permanent residence. She spent Monday night with Jacqueline Haydel and Tuesday night with Michael Hood, whose apartment was located across the hall from Haydel's.
Hood testified he met decedent two days before she was killed.[8] He admitted decedent spent Tuesday night with him and they had intercourse. On Wednesday, they slept in late and decedent napped during the afternoon. Neither one had anything to eat.[9] He stated, about the time decedent got out of bed his girlfriend, Dorothy "Dorsey" Forbes, arrived from Missouri.
In honor of the arrival of Dorsey, Hood testified he planned an impromptu barbeque for that evening and assigned decedent the job of acquiring a hibachi.[10] In the late afternoon of May 6th, he saw decedent talking to defendant. He testified he called out to her, inquiring whether she intended to get the hibachi for the barbeque. And he claimed she indicated her assent.
Decedent's contested extrajudicial declaration is contained in the following portion of Hood's testimony:
Ms. Bernie:
Q. Had you seen her [the victim] the previous day [Tuesday, May 5th]? Michael Hood:
A. Yes.
Q. When was that?
A. I had seen her in the evening about 6:30 or 7:00 o'clock.
Q. Do you know the defendantat the time did you know the defendant, George B. Brown?
A. No, ma'am, I didn't.
Q. Did you have occasion to see him on May 5, 1987?
A. Yes.
Q. And where was that?
A. On the sidewalk talking to Sheri.
Q. Had you been talking to Sheri at all before that?
A. Yeah.
Q. And then how didhow did she happen to be talking to the defendant?
A. Well, they were justthey were about fifteen foot from, you know, and they were justthey were talking, and I couldn't hear. So I don't remember what they said.

*873 Q. Did they stay talking and you walk away, or what happened?
A. No, II was sitting on the porch, and they talked for a while, and then she came back to the porch.
Q. Did she tell you what they talked about?
A. I
[At this point, defense counsel objected to the question on grounds of hearsay. The State asserted the admissibility of the testimony it sought to elicit as an exception to the hearsay rule because it evinces the victim's state of mind, citing State v. Raymond, 258 La. 1, 245 So.2d 335 (1971), app dis'md & cert. den., Ramos v. Louisiana, 404 U.S. 805, 92 S.Ct. 101, 30 L.Ed.2d 38 (1971). The court then retired the jury. After listening to arguments on the applicability of Raymond, the court requested a preliminary review of the testimony sought to be elicited. The State responded that, pertaining to the decedent's conversation, "What did Sheri tell you?", was the State's only question. And the witness, Michael Hood, replied his answer would be, "She told me that he wanted to have sex with her, and she didn't want anything to do with him." After hearing further arguments of defense counsel, the court overruled the objection and ordered the jurors returned to the courtroom.]
Ms. Bernie:
Q. Michael, was there a conversation that you observednot heard, but observed between the defendant and Sheri?
A. Yes.
Q. And after that conversation who went where?
A. Well, he walked off, and me and Sheri went up to Jackie's apartment.
Q. Did Sheri tell you what the defendant had said?
A. Yes.
Q. Could you please relate to the ladies and gentlemen of the jury the nature of their conversation?
A. Well, I had asked her what he had said or wanted, and she told me that he wanted to have sex with her, and she didn't want anything to do with him.
Q. After that, did you see the defendant again?
A. The next day.
Q. And when was that?
A. Around 5:00 o'clock or 5:30.
Q. Where was that?
A. Standing at the bottom of my stairs with Sheri.
Q. Did you havedid you say anything to Sheri?
A. Yes, I asked her if she was going to get the hibachi so we could go ahead and barbeque. (emphasis added).
Not long after Hood's reminder to get the hibachi, defendant was seen sitting in his 1974 bronze Mercury Montego in the lot outside Prescott Place apartments (about two blocks away from Hood's apartment), while decedent carried the uniquely styled hibachi[11] down the stairs. Deputy Sheriff Derrick Fox, the apartment security guard, testified he observed decedent's actions and her clothing. He attested decedent put the hibachi in defendant's car and watched them drive off.
Kimberly Cagle, one of the defendant's friends, testified she also observed defendant speaking to the decedent in the afternoon of May 6th. She explained defendant was a little on edge or restless that day, but not much more than usual. Her trial testimony further revealed:
Ms. Bernie:
Q. Let me call your attention to Wednesday, May 6, 1987. Did you see the defendant?
Kimberly Cagle:
A. Yes, ma'am.
Q. Did you speak with him at any time?
A. Yes, ma'am.
Q. And can you tell me the nature of your conversation?
A. We were all standing outside just kind of goofing around and Benny came up to talk to us just like any other day. *874 And we justwe started to talk. And he said that he needed to have a woman andI just kind ofI asked him, I said, well, don't you have a girlfriend? And he said, that they had broken up, and that was the extent of the conversation basically.
Q. Did you see him again that day?
A. Yes, I did.
Q. And where was that?
A. It was right in front of my apartment.
* * * * * *
[Cagle observed Benny speaking to a girl she had not met, but later learned was the decedent.]
Q. Did you see them stay together or leave, or what did you see them do?
A. I was sitting in my living room, and I have a large picture window in the front of my apartment, and I saw them talking together and walk off ... (emphasis added)
Thus, when all indicators revealed defendant was the last person with whom decedent had been seen,[12] Lt. Keller testified they sought out defendant. They arrived at the apartment of Scott Fisher, defendant's roommate of 3 weeks, in the early morning hours of May 8th. When Fisher answered the door, he initially denied all knowledge of defendant.[13] The detectives testified they returned a while later and again spoke to Fisher. This time the detectives informed him they were investigating a murder of a young female. When Fisher went inside to put on clothing, he informed defendant of the serious nature behind the investigators' presence and defendant fled through a window.[14] Lt. Keller testified, by morning, they obtained search warrants and searched Fisher's apartment and defendant's vehicle which was parked in the lot outside Fisher's apartment.[15]
Laura Cramer, defendant's former girlfriend, testified she found defendant sleeping in her bedroom around 4:00 on Friday afternoon. Cramer stated she gathered some clothing, went to a nearby 7-11 and called the police. Later, she learned defendant broke in through a bedroom window.
*875 That evening, defendant voluntarily went to the sheriff's department for questioning. Lt. Keller testified he did not record his first interview with defendant, held on Friday evening. Detectives informed defendant they were investigating decedent's murder. Lt. Keller testified defendant, in turn, related the following events. After decedent picked up the hibachi, they went to his apartment. Hood joined them. Soon, Hood and decedent began to argue over her unborn child, because Hood was the father. The two then borrowed his car keys about 7:00 p.m. and left. He took a shower and then went to Capitol Grocery to chat with his roommate, Fisher, and friends.[16] By 8:30 his vehicle was back in the parking lot. Lt. Keller stated that during the interview, defendant denied knowledge of or ever having been to the abandoned house and property off Seigen Lane. He also claimed he fled from the police because of his parole violation.
Skeptical of the story defendant told them, Lt. Keller testified he brought Hood to the station for a confrontation with defendant. After Hood arrived, defendant accused him of killing decedent and the confrontation erupted with shouting. Lt. Keller clarified that defendant learned from the confrontation Hood could not be the father of decedent's unborn child because of Hood's prison term for his 4th DWI. The detectives eventually arrested defendant early Saturday morning for parole violation and felon registration violation.
Cramer testified defendant called her twice on Saturday while he was in police custody. His first call was in the morning. She attested he said, "something to the effect of had I seen the [news]paper or had I seen what had happened, and I said, yes. And he asked me, you know, did I see where it happened? And I said, yes. He said something about wasn't it wild or crazy or, you know, something along those lines, and I said, yes. And he asked me if I had told anybody that I had been there or I knew where the place was, and I said, no. And he said he hadn't told anybody and asked me not to tell anybody." The second telephone call was in the afternoon or evening. She testified, "about all I can remember was he asked me again if I had told anybody where the place was, and he said something to the effect that he hoped I didn't `F' him over."
Cramer affirmed defendant knew the abandoned house at 10433 Seigen Lane because he stayed there in August or September of 1986.[17] Further, she stated she used to pick him up and drop him off at that location. Roy Skiba also attested to defendant's knowledge of the house at 10433 Seigen Lane. Skiba stated his family resided in the house at the time defendant dated his sister, Dawn. While defendant and his sister were dating, Skiba indicated defendant came over every couple of days until the two began living together off Nicholson Drive. Skiba also testified defendant stayed nights at the house and, on one occasion, tried to unstop a septic tank line.
During the direct examination of Lt. Keller, the jury also heard the excised tape recording of defendant's second custodial interview with the detectives, held on Monday, May 11th. Lt. Keller explained how, during the interview, defendant's demeanor changed from being "very calm, very collected," with his voice smoothly answering their questions, to being very upset. When the detectives confronted him "with apparent *876 lie after lie," Lt. Keller stated he started shaking, his eyes teared up and he rocked back and forth in his chair. During the interview, defendant was shown photographs of the area surrounding the abandoned house, but continued denying prior knowledge of the place. Lt. Keller stated defendant continued to hedge on his answers even when he learned detectives knew about Dawn Skiba. However, when detectives intimated they knew about Cramer, Lt. Keller related defendant's demeanor changed abruptly and he asked for an attorney.[18]

C. THE STATE'S CLOSING ARGUMENTS
In its closing argument, the State told the jury it showed decedent was in limbo on May 6th and was looking for a place to stay. After she broke-up with Beatty, she stayed one night with Haydel and one night with Hood. With the appearance of Forbes, however, decedent continued to need a place to stay. The State also told,
how they all planned to barbeque. Michael told you this as well. Michael was going to provide the chicken, but they needed a grill for cooking. Michael told you how he had asked Sherri (sic)could Sherri bring over the barbeque grill that she and Paul had at his apartment a few blocks away. And Michael told you that he saw Sherri talking to the defendant, Benny Brown. He didn't really know Mr. Brown. He had seen him the day before talking to Sherri, and Sherri had askedhe had talked to Sherri about what was all that all about? And Michael told you that Sherri said, well, he wants to be with me. He wants to have sex, but I'm not interested in him. That was on the 5th. On the 6th they're talking. Michael asked Sherri to get the hibachi, and she says, okay. And the defendant agrees to take her in his car, his Mercury Montego, to Prescott Place apartments where the hibachi is. Its about 5:30, maybe 6:00 o'clock. The defendant had earlier had a conversation with Kimberly Cagle. He's her friend, and Kimberly said, what are you going to do tonight? He said, I don't know. I need a woman. And she said that he was restless, a little on edge. And he volunteers to take Sherri to pick up the hibachi ... (emphasis added).
The State then continued to outline the facts establishing decedent's last known movements. Afterwards, the State hypothesized defendant suggested to decedent she stay at the secluded, abandoned house off Seigen Lane. The State commented, even those who live in the area and are familiar with the location did not know of the existence of this house. The State then proposed how the murder occurred:
And I suggest to you that the evidence supports that he took her there, and perhaps he decided to try again to see if she wanted to have sex with him. And she said, no, and there was a struggle. Perhaps that's what happened at the site of the house. A piece of board ripped off. You saw her pants pulled down. It didn't get that way once she was inside the septic tank. And I suggest to you that defendant got mad when she said no, and he hit her. Dr. Suarez said the cut to her chin would be consistent with a fist. And you heard there was a lot of junka lot of things around and he lost it, and he picked up an object and he whacked her one, two, three, four, five, six, seven, eight times on theher head...
The State continued with suggestions of defendant's movements, immediately following the murder and throughout the evening and following morning. After dropping the body into the septic tank and hurling the physical evidence into the woods, the State hypothesized he returned to his apartment. He wanted to be seen *877 that evening, so when Fisher got off work at 9:00, they went out and played pool. But sometime between when they returned home at 1:00 a.m. and dawn, he went back to the crime scene to assure himself no clues were left behind.
The State then recapped the discovery of the body and the investigation which ensued. The State remarked to the jury the investigation centered on defendant because he consistently was the last person with whom decedent had been seen. Defendant's flight was commented upon and the jury was informed flight could be considered with respect to the defendant's guilty knowledge. Defendant's statements to detectives, in which he blamed Hood for the murder and said he had never been to the abandoned house, were also commented upon. The State reasserted the testimony of the witnesses who could account for Hood's actions the entire evening and night of May 6th and the testimony of defendant's former girlfriend, Cramer, who defendant had warned not to tell of his knowledge of the abandoned house.
On rebuttal, the State answered the defense's theory that defendant had been framed and commented on the defense's additional "red herring" arguments. The State asserted defendant's attempted alibi set the time frame for decedent's death. Defendant told police Hood had his car on May 6th from 7:00-8:30 p.m., while defendant was at Capital Grocery. But the State reminded the jury, his own witness, Fisher, who works at the grocery as a checker, stated defendant left the grocery at 5:30 to 6:00 and never returned.
The State then asserted,
Let's get back to the facts that were proven, not speculation, and what the State has to prove. The State has to prove that the defendant was the offender who killed Sheri Lynn Daigle. I don't have to prove the murder weapon. I don't have to prove motive, although I suggest to you ladies and gentlemen, that I have established a motive. The fact that he was working the next day or playing pool that night does not negate the fact that just cold-blooded because whoever did that, as he said on the tape, is cold-blooded ... (emphasis added).
Thereafter, the State once again reviewed all the evidence presented at trial. The State concluded its argument by directing the jury's attention to the direct evidence against defendant: the testimony of Fox, Fender and Holt, the tire impression, the discovery of the hibachi at the crime scene, and the testimony establishing defendant's familiarity with the house and septic tanks.

LEGAL PRECEPTS
"Hearsay" is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. LSA-C.O.E. Art. 801(C).[19] Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter who is not subject to cross-examination and other safeguards of reliability. State v. Martin, 458 So.2d 454 (La.1984). However, when an extrajudicial declaration or statement is offered for a purpose other than to establish the truth of the assertion, its evidentiary value is not dependant upon the credibility of the out-of-court asserter and the declaration or statement falls outside the scope of the hearsay exclusionary rule. See Id. For example, see State v. Raymond, supra [the victim's extrajudicial declaration of fear of or revulsion by defendant (due to defendant's homosexual advances) was admitted as relevant, non-hearsay circumstantial evidence concerning the victim's state of mind about defendant].
One of the traditional hearsay exceptions allows the introduction of extrajudicial declarations at trial to prove the state of mind of the declarant. State v. Sheppard, 371 So.2d 1135 (La.1979); State v. *878 Weedon, 342 So.2d 642 (La.1977). Thus, whether the declaration is a direct assertion of the speaker's state of mind (hearsay) or whether the declaration tends to indirectly establish the declarant's state of mind (non-hearsay), Louisiana jurisprudence admits the declaration if the declarant's state of mind is at issue or is relevant to prove a fact at issue. State v. Martin, supra [relevancy is a requirement for both the hearsay and non-hearsay extrajudicial declarations]. This tradition was formally adopted by the legislature in LSA-C.O.E. Art. 803(3):
Art. 803 Hearsay exceptions; availability of the declarant immaterial
The following are not excluded by the hearsay rule, even though the declarant is an available witness:
* * * * * *

(3) Then existing mental, emotional or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or his future action. A statement of memory or belief, however, is not admissible to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's testament.
The official comments to Article 803 indicate section 3 thereof clarifies prior Louisiana law and generally follows F.R.E. 803(3). Louisiana's section 3 differs from its parent rule by adding the phrase, "offered to prove the declarant's then existing condition or his future action," in order to accord with prior state jurisprudence. Comment 803(3)(b); See State v. Weedon, supra [an extrajudicial declaration by one person is inadmissible to show the subsequent conduct of another]. The comments also clarify the exception covers declarations only when the declarant's state of mind is a fact at issue, although it need not be an ultimate issue. Comment 803(3)(c); See State v. Doze, 384 So.2d 351 (La.1980) [declarant's state of mind was not at issue; however, the defendant's state of mind was at issue but the evidence could not be used to prove his motive for the killing].
A state of mind declaration is relevant if it has a tendency to make the existence of any consequential fact more or less probative than it would otherwise be without the evidence. See former LSA-R.S. 15:441-442; LSA-C.O.E. Art. 401. Nevertheless, relevant declarations may be legally inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misapplication by the jury. See LSA-C. O.E. Art. 403. When there is no evidence showing the decedent communicated his or her intention to the defendant, hearsay evidence of decedent's declaration is not relevant and may not be introduced to prove defendant's motive. However, when the declaration of intent or state of mind is used to show the decedent's own subsequent acts, its relevance is not dependent upon communication to the defendant. State v. Martin, supra. Cf. State v. Doze, supra; State v. Weedon, supra.
Extrajudicial statements of declarant's subjective fear or revulsion have considerable probative value in circumstantially explaining the declarant's subsequent conduct. See Lilly, An Introduction to the Law of Evidence, 2d ed., section 7.12-7.13 [Even when the declarant's state of mind is not the ultimate proposition to be proven, the declaration may be used as circumstantial evidence of declarant's behavior by providing an intermediate basis for further inferences about declarant's conduct. Where extrajudicial declarations are offered to show the declarant's state of mind or intent to undertake a course of action, when the communication indicates the act is dependent upon an event or upon acts of another, the contingency operates only to reduce the probative force (weight) of the evidence, but not its admissibility. The declaration remains admissible under the state of mind exception (it is hearsay if the use of the evidence necessitates reliance upon the truth of the declarant's assertion) even if it carries with it the associated inference that the other possible *879 participant acted or undertook a course of conduct.] The declarations are non-hearsay if offered only to circumstantially prove decedent's state of mind prior to the homicide. State v. Tonubbee, 420 So.2d 126 (La.1982), cert. den., Tonubbee v. Louisiana, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983).
Declarations of fear and revulsion, however, characteristically contain both admissible and inadmissible hearsay components through referencing past acts, predictions of defendant's future conduct or statements of decedent's beliefs. Cf. People v. Madson, 638 P.2d 18 (Colo.1981), en banc. Consequently, the admissibility of such statements, "must be determined by a careful balancing of their probative value against their prejudicial effect." United States v. Brown, 160 U.S.App.D.C. 190, 490 F.2d 758, 766 (1974); Bennett v. U.S., 375 A.2d 499 (D.C. Ct. of App.1977). The relevancy of the admissible portion of the declaration must be weighed then against the inadmissible portion. Cf. People v. Madson, supra. And the trial court's task is to balance the need for the evidence, when used for the proper purpose, against the danger of the evidence being used by the jury for an improper purpose. State v. Wille, 559 So.2d 1321 (La.1990).
Declarations of fear or revulsion either take the form of direct evidence of the mental state ("I am afraid of defendant") and, as such, are hearsay offered to prove their contents. Or, they take the form of evidence circumstantially probative of the declarant's state of mind ("Defendant threatened to kill me."). Technically, the latter assertions are not hearsay because they are not offered to prove the truth of what was said, but to circumstantially show the declarant's state of mind toward defendant and, hence, are not hearsay. Bennett v. U.S., supra. Invariably, these declarations involve extraneous factual elements. Id.
Declarations of fear, however, should be distinguished from declarations of revulsion, because declarations of fear consistently reflect upon defendant's past or future aggressive actions, defendant's culpability, or the dispositive issue of the case. Cf. Bennett v. U.S., supra; United States v. Brown, supra. Therefore, the risk of prejudicial effect and improper use of the evidence of fear increases. Correspondingly, the need for the declaration, used for its proper purpose, must be great as when the evidence is relevant to a material issue of the case. Thus, in homicides, evidence of the victim's fear may be limited to situations where defendant has made the criminal character of the death an issue, by raising defenses of self-defense, suicide or accident. People v. Madson, supra; State v. Garcia, 102 Idaho 378, 630 P.2d 665 (1981); United States v. Brown, supra. Cf. State v. Martin, supra [defendant claimed self-defense]; State v. Sheppard, supra [defendant claimed self-defense]. Decedent's declaration of fear, then, is relevant to circumstantially rebut the defense's theory. To protect against misapplication of the extrajudicial declaration, its opponent is entitled to a limiting instruction, directing the jury to consider the declarant's statement as evidence only of the declarant's state of mind rather than for the truthfulness of any express or implied allegations contained within the statement. Cf. Bennett v. U.S., supra.
In contrast, declarations of revulsion ("I don't like defendant." or "I'm not interested in having a casual affair with anyone.") may circumstantially evince declarant's expected reaction to defendant or show the probable nature of their future conduct, without necessarily averting to defendant's aggressive or culpable acts. But see State v. Raymond, supra [declaration of revulsion averted to defendant's prior homosexual conduct]. The risk of unfair prejudice to defendant by confusing the jury with inflammatory or dispositive allegations, therefore, decreases. Consequently, in homicide cases, extrajudicial declarations of revulsion have been found relevant, admissible evidence as immediately antecedent circumstances explanatory of the killing and tending to connect the accused with it. State v. Raymond, supra, 245 So.2d at 432 (Tate, J., concurring); *880 State v. Weedon, supra; State v. Tonubbee, supra.

APPLICATION OF PRECEPTS TO FACTS
On the second day of trial, Hood testified he asked decedent "what he [defendant] had said or wanted, and she told [him] that he wanted to have sex with her, and she doesn't want to have anything to do with him." The State offered the evidence, and continues to offer it, as admissible hearsay of direct evidence of the decedent's sexual aversion towards defendant and as admissible non-hearsay evidence circumstantially explaining decedent's subsequent conduct. We agree it is admissible as such. The extrajudicial declaration, introduced to prove the declarant's state of mind, is relevant to show she was not sexually interested in Brown and would have subsequently rejected his sexual advances. Her state of mind became a fact at issue from evidence elicited on cross-examination when it was coupled with other facts in evidence. And the evidence's probativeness outweighed any prejudice caused by its admittance.
Although decedent's state of mind was not an ultimate issue at trial, it became an indirect, but material fact at issue. Testimonial and photographic evidence indicated decedent's death was preceded by unwanted sexual advances. Testimonial evidence suggested decedent willingly accompanied Brown to and from Prescott Place apartments. It also revealed she was sexually active as she was eighteen years old, unmarried and pregnant; had lived with Beatty; and had sexual intercourse with Hood, an acquaintance of two days. Moreover, cross-examination of State witnesses, Fox and Fender, implicated decedent's state of mind by eliciting testimony about her demeanor while entering Brown's vehicle and while driving off with him.
The evidence of their harmonious interaction in the hours preceding her death, coupled with the evidence of her sexual permissiveness and of her partial disrobement, indirectly placed her state of mind at issue. The State needed to respond to the implication their interaction would remain harmonious under all circumstances. Her extrajudicial declaration, therefore, became probative as direct evidence of their future relationship entailing her wish not to have intercourse or sexual relations with him, and as circumstantial evidence that, if the opportunity arose, she would reject his sexual advances.
By communicating her perception that defendant "wanted her", the declaration contained an inadmissible hearsay component. The significance of the assertion, however, overshadowed any resulting prejudice. The assertion of defendant's desires is necessary to properly construe decedent's statement, she "didn't want anything to do with him." It does not improperly refer to past beliefs or acts, or predict future conduct. Nor does it imply Brown has committed or will commit inflammatory or culpable acts.
Thus, the relevancy and probative value of the evidence, when used to show decedent was sexually disinterested in defendant and would have rejected his advances, far outweighed the danger of the jury misusing the evidence. The trial court struck the proper balance when it ruled the extrajudicial declaration admissible. Furthermore, any improper inference the jury might have drawn from the declaration is overshadowed by defendant's statement to Cagle, evincing his subjective state of mind that "he needed to have a woman."
To protect against any possible misapplication of the extrajudicial declaration, Brown should have requested a limiting instruction, directing the jury to consider the declaration as evidence only of decedent's state of mind or of circumstantial proof of her subsequent conduct rather than for the truthfulness of the assertion he "wanted her." Nevertheless, a review of the record as a whole demonstrates this omission is harmless. The State's opening statement, direct examination of Hood and closing arguments reveal, very little emphasis was placed upon the extrajudicial statement during the five day trial. Consequently, *881 due to the overwhelming evidence of Brown's guilt, the lack of limiting instruction had minimal impact on the jury.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed and the defendant's conviction and sentence are reinstated. This case is remanded to the court of appeal for consideration of defendant's assignments of error pretermitted on original appeal.
REVERSED AND REMANDED.
LEMMON, J., dissents and assigns reasons.
DENNIS, J., dissents with reasons.
LEMMON, Justice, dissenting.
Over defendant's objection, the prosecutor elicited the hearsay statement by the victim that "she [the victim] told me [the witness] that he [the defendant] wanted to have sex with her [the victim], and she didn't want anything to do with him".[1]
A hearsay statement establishing the speaker's then existing state of mind is admissible to prove the speaker's subsequent acts. State v. Martin, 458 So.2d 454 (La.1984); see La.Code Evid. art. 803(3). The statement in the present case consisted of two separate assertions by the victim. The part of the statement which established the victim's state of mind (that she was not interested in having sex with the defendant) was arguably admissible as an exception to the hearsay rule. However, this evidence, admitted under the state of mind exception to prove that the victim would probably have resisted defendant's sexual advances if he subsequently made any, had little relevance unless there was proof by other admissible evidence establishing the probability that defendant made sexual advances toward the victim.
The critical problem involves the other portion of the hearsay statement. This assertion constituted proof, not of the then existing state of mind of the victim, but of a past act by the defendant in making sexual advances toward the victim (which the victim rebuffed). This portion of the statement clearly does not fall under any exception to the hearsay rule.
When one focuses separately on each portion of the statement, it becomes obvious that the prosecutor was much more interested in proving the defendant's past acts, as a means of showing that he probably acted in the same manner on the day of the murder, than in proving the victim's then existing state of mind to show the probability that she would resist any later sexual advances. The prosecutor's emphasis in opening and closing arguments on defendant's conduct, as established by the victim's hearsay statement, leaves no doubt as to the prosecutor's principal purpose.
I therefore conclude that the hearsay statement by the victim was improperly admitted because it not only constituted evidence of the victim's existing state of mind to prove her future conduct (a matter of marginal relevance), but also constituted evidence asserting a past act by the defendant tending to prove his future conduct. The prosecutor's need of part of the evidence for the proper purpose of showing the victim's state of mind is greatly outweighed by the danger of improper use of the other part of the evidence by the jury as an assertion of defendant's past behavior. State v. Wille, 559 So.2d 1321 (La. 1990).
Whether admission of the statement was harmless error is a close question. Because the statement put before the jury a fact not otherwise suggested by the evidencethat defendant had previously made sexual advances toward the victim and had been flatly spurnedI cannot conclude beyond a reasonable doubt that the statement informing the jury of defendant's rejected sexual advances could not have influenced the verdict. Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).
*882 DENNIS, Justice, dissenting.
I respectfully dissent. The witness testified that the declarant stated that the defendant "wanted to have sex with her, and she didn't want anything to do with him." The majority concludes that the second part of this statement is admissible as a declaration of the declarant's mental state. The court further concludes that while the first part of the statement, that defendant wished to have sex with decedent, is inadmissible hearsay, the conviction may be upheld because it is a necessary antecedent to the admissible portion of the statement and its admission is harmless error. I must disagree with the court's treatment of both parts of the statement.
La.Code Evid. art. 803(3) allows the introduction of hearsay evidence to prove the state of mind or future action of a declarant. When such a statement involves future cooperative action, however, a problem arises because the declaration may lead to an inference that another person took certain actions. As one commentator has described the problem of the tendency of such a statement to prove action on the part of another:
If those cooperative actions themselves are at issue, there is a significant danger that the jury will use the declarant's statements as proof not only of the declarant's actions but also of the cooperative actions by the third person. In effect, the declarant's statement will be taken as proof of the other person's intent and as proof that this intent was carried out. For example, in the homicide prosecution of Frank, a witness testifies that on the morning of the killing the victim said, "I am going out with Frank tonight." While this tends to prove the victim's acts, it also tends to prove that Frank, the accused, went out with the victim, a fact very much in issue.
E. Cleary, McCormick on
Evidence § 295, at 849
(3rd ed. 1984).
The redactors of the Code of Evidence recognized this problem, stating in comment (b) to art. 803(3) that "an out-of-court declaration by one person is inadmissible to show what another person did."
In State v. Doze, 384 So.2d 351 (La.1980), the state offered a murder victim's statement of her intent to evict the defendant. The court stated:
The state of mind of the victim is relevant to the existence of a motive for the killing only if two further inferences are made from the initial inference that the victim did intend to evict the defendant. The first of these additional inferences is that the victim actually transformed her intention into action, that she took some affirmative steps to "get that man out of her house." .... The final and crucial inference which must be made is that the victim communicated her intention to the defendant and that the defendant reacted to this communication. Only if her intention to evict defendant were known to the defendant himself, would it have any relevance to his subsequent conduct. There is no evidence whatsoever that would tend to support this inference, but there is a real danger that a jury might interpret the fact to be proved (that the defendant attacked his landlady) as evidence of the fact to be inferred from the hearsay testimony (that his landlady ordered him to leave the premises.)
384 So.2d at 353.
Because of the danger of the jury drawing the improper inferences from the hearsay statement, and the questionable relevance of the victim's state of mind or future actions to the facts at issue, the evidence was ruled inadmissible. See also State v. Johnson, 381 So.2d 436 (La.1980); State v. Weedon, 342 So.2d 642 (La.1977); State v. Raymond, 258 La. 1, 25-30, 245 So.2d 335, 343-45 (1971) (Barham, J., dissenting).
In the present case, the state offered the statement to show that the victim did not want to have sex with the defendant. The prosecution claims that her state of mind and her presumed subsequent action in refusing to have sex with the defendant tends to provide a motive for the murder, namely that the defendant became angry and killed the victim when she refused to have sex with him. To reach this conclusion, *883 however, the factfinder must infer (1) that the victim did not wish to have sex with the defendant, (2) that the defendant did wish to have sex with the victim, (3) that the defendant subsequently attempted to have sex with the victim, (4) that the victim refused, and (5) that the defendant reacted violently to this refusal. Only (1) and (4) are inferences that may properly be drawn from the admissible statement. Because of the great possibility that improper and prejudicial inferences would be drawn from the statement, and the questionable relevance of the victim's state of mind and possible future course of action to the issue of whether defendant killed her, I would hold the statement inadmissible.
If there only existed the possibility that such improper inferences would be drawn from the declaration, then the majority might be justified in either allowing the admissibility of the second portion of the statement despite the marginal relevancy of the victim's state of mind or proposed course of action or finding the admission harmless error. See State v. Doze, 384 So.2d at 354. The admission of the first portion of the statement, however, compounds the problems with the second portion. The majority correctly concludes that the statement by the victim that the defendant wanted to have sex with her was clearly inadmissible hearsay, but the court goes on to find that the admission of this portion of the statement was harmless error. I disagree. The evidence is unreliable hearsay, and it is prejudicial because it tends to show that the defendant desired to have sex with the victim and that he subsequently attempted to have sex with the victim. As discussed above, these improper and prejudicial inferences are precisely the inferences that may not be drawn from the second part of the statement. Accordingly, the effect of admitting both portions of the statement is to reinforce and reemphasize the conclusions that the jury could reach only if it used the evidence improperly. Needless to say, this problem was further accentuated by the failure of the trial court to give limiting instructions. Because the hearsay statement increased and almost insured that the "state of mind" statement would be improperly used, the error in allowing its admission was not harmless. I would affirm the judgment of the court of appeal.
NOTES
[*] Judge Thomas C. Wicker, Jr., Court of Appeal, Fifth Circuit, sitting ad hoc for Judge Melvin A. Shortess, Associate Justice pro tempore.
[1] The house is 642 feet off Seigen Lane.
[2] Deputy Sheriff Carson Bueto described the area as "there were weeds back there almost as thick as straw on a broom and as tall as my head."
[3] The puddle of blood was approximately 12 inches in diameter, saturated more in the middle than the edges. It was uncoagulated and appeared fresh. Dr. Alfredo Suarez, a forensic pathologist, explained to the court that when blood is outside the body, it will coagulate. However, in the blood is an enzymea proteinwhich will act upon other proteins and uncoagulate the already coagulated blood. Therefore, to the naked eye, because the blood on the trail had been in a humid and moist environment, even if it were a day old it could give the appearance of just having come out of someone's body.

Lt. Charles Guarino, the forensic serologist who examined the blood found on the trail, testified his test results were inconclusive. Thus, the blood on the trail could not be typed. He determined the blood was human blood, but it was so dirty and contaminated it could not be typed. Likewise, he found decedent's blood could not be typed. He opined the E-Coli, the bacteria commonly found in sewers, might have grown in her blood and produced its own B antigens, masking her blood type.
[4] Jim Churchman, a forensic scientist with the state police crime lab, testified that his comparison of the cast made from this tire impression to the left rear tire of defendant's vehicle revealed the two had identical tread design. His comparison also revealed that while he could not positively conclude the defendant's tire made the impression, the wear characteristics of the tire and those present on the cast of the impression have such similarities he could not state the defendant's left rear tire did not make the impression.
[5] On the first day of trial, the jury visited the crime scene.
[6] Dr. Suarez, the forensic pathologist who performed the autopsy, testified that based upon the degree of rigidity of the body which he observed from the numerous photographs taken of the body in various configurations and based upon the body having been submerged in cool, underground water, he opined decedent had died 6 to 24 hours before the photographs were taken (7:00 p.m.). But he thought it was closer to 24 hours than to the lower hours.
[7] Beatty worked as a bartender at the Baton Rouge Hilton and had gotten off work at approximately 9:00 p.m. on the night of the murder. He did not own a vehicle. His only means of transportation was his bicycle or public transportation. When, on the evening of May 6th, he discovered the disappearance of his hibachi, he immediately sought answers from Hood.
[8] Hood was released on April 30th from parish prison after serving time on his 4th DWI conviction. His sentence had commenced on January 23rd. As a result of his 4th conviction he had a 7:00 p.m. to 6:00 a.m. curfew and he was contacted twice daily by his parole officer to ensure his compliance with the curfew. He did not own a car or have a driver's license.
[9] The autopsy showed decedent had not eaten during the hours before her death but she had ingested a liquid. Liquids are digested by the stomach in 30 minutes of ingestion, while light meals are digested in 2 to 3 hours and heavy meals are digested in 6 to 8 hours.
[10] When decedent failed to return with the hibachi, the barbeque turned into a chicken fry. Forbes testified she remained in Hood's company the entire evening. Haydel joined them for dinner. Hood's parole officer also visited them about 8:30 to verify Hood was obeying his court imposed curfew.
[11] The State called Beatty, Fox and Vince Fender to identify the round hibachi. It was found in the weeds off the front of the abandoned house on Monday, May 11th.
[12] The last time Hood saw decedent was when she left with defendant to obtain the hibachi. Derrick Fox, the deputy sheriff who lived at Prescott Place apartments and who served as the apartment's security guard, testified he saw decedent carry the hibachi down the apartment building's stairs and place it in defendant's automobile before he saw the two drive off. Subsequently, Cheryl Robin Holt saw decedent in defendant's car traveling down 6th Street towards Capital Lakes Park. She had a gang of people on her porch, decedent waved and they waved back. Vince Fender, who formerly had been decedent and Beatty's landlord and neighbor was among the group on Holt's porch. He, too, testified he observed decedent in defendant's car and had seen her wave.
[13] At that time, defendant was inside the apartment. Fisher testified he did not initially tell defendant about the police. Fisher explained, just prior to the detectives' arrival, he had purchased cocaine. Consequently, he was extremely agitated by their presence.
[14] Defendant told Lt. Keller he fled through the window because he thought the police were investigating his Houston, Texas parole violation.

Fisher was called as a witness for the defense. He told the jury that when defendant was informed of the murder investigation, his demeanor changed to "a state of panic." He explained his reaction, however, as being caused by his fear of being arrested for the parole violation.
Fisher also described a large wet spot he found on the chairback of the front passenger seat of defendant's vehicle at about 10:00 p.m., Wednesday night. He described it as not being sticky. Instead, it felt like a thick lotion. Defendant told him a drink spilled and then he covered it with a towel. Blood tests of the vehicle, however, did not produce positive results.
[15] Elgin Campbell, who has 20/20 vision, testified he has lived across the street from 10443 Seigen Lane for 10 years. At daybreak on May 7th, he was standing at the end of his driveway, waiting for his wife so he could drive her to the airport. And he observed a vehicle, which he later identified as having the same shape and lines as defendant's Mercury Montego, coming onto Seigen Lane from the area of the abandoned house. He thought it was odd because no one had lived there for several months and the car had been too far up the unpaved road to be merely turning around. Further, its lights were not on.

Campbell also testified the vehicle had a faulty exhaust system because its muffler made a loud noise. When he identified the car for the police, he commented the car he observed had a muffler problem. Police personnel then mechanically lifted defendant's vehicle and Campbell observed a large hole in its muffler.
[16] Fisher testified, however, he did not see defendant from 5:30 to 9:00 p.m. on May 6th.
[17] Even though Cramer's parents lived not far from the abandoned house, before defendant showed her the house, she had not known of its existence. At trial, her father, Thomas E. Hart, also testified. He told the jury, when defendant asked him to fix an automobile for his friends who were staying at the abandoned house, he asked for directions. But, defendant responded, "I will have to show you because it's real hard to find ... it's right around the corner from your house." When asked to identify the house and property at 10443 Seigen Lane from the photographs the detectives showed him, Hart testified that even though he had been to the house on only one occasion, for 30 minutes, a couple of years before, he did not recall having any trouble identifying the house from the photographs the detectives showed him. Lt. Keller testified when he showed those same photographs to defendant, he declared he did not recognize the house or area.
[18] On defendant's pretrial motion, the trial court ordered the suppression of the additional facts surrounding defendant's reaction to the extent of the detective's knowledge. Particularly, the State was prohibited from informing the jury defendant attempted to destroy the recording of the interview and committed simple battery on a police officer during his attempt. Likewise, the State was prohibited from informing the jury defendant pled guilty to the offenses of unauthorized entry of Cramer's apartment and of simple battery on a police officer.
[19] Section 1 of Act 1988, No. 515, enacting the Louisiana Code of Evidence, became effective January 1, 1989. Section 8 of that Act repealed LSA-R.S. 15:434 which dealt with hearsay in criminal proceedings. Defendant's trial was held on March 16, 17, 18, 19, and 21, 1988, before the effective date of the Code.
[1] The statement was clearly hearsay, because it was offered to show the truth of an assertion that depended on the credibility of an out-of-court declarant who was not under oath at the time and not available for cross-examination at trial.