rgaidry, j.
The defendant, Ronald W. Adams, was indicted for two counts of first degree murder (counts I and II) under La. R.S. 14:30, and pled not guilty on each count. Following a jury trial, he was found guilty as charged on both counts by unanimous verdict. The jury was unable to reach a unanimous verdict on either of the counts during the penalty phase. Defendant moved for a new trial, a post-verdict judgment of acquittal, and arrest of judgment, *630 but his motions were denied. He was sentenced on each count to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, with the sentences to run consecutively. He now appeals, designating two assignments of error. For the following reasons, we affirm the convictions and sentences.
FACTS
On Sunday, September 21, 1997, at approximately 9:21 p.m., Karen Wilcox arrived at the mobile home where she lived in Slidell with her parents, James Ronald Adams and Catherine Adams, and discovered their bodies. James Adams had suffered numerous stab and slash wounds, including a stab wound through his neck, which severed his carotid artery. He had also been shot in the neck. A stab wound to his abdomen had penetrated his liver. There was also a wound to his forehead consistent with being struck with the butt of a rifle or shotgun. Catherine Adams had also suffered numerous stab and slash wounds, including a large slash wound to her neck, which severed her carotid artery. She had suffered a fractured skull and a portion of her scalp had been torn off. Both victims died within three to five minutes of the transection of their carotid arteries. When the victims were discovered, the safe in their mobile home was open. It had |3contained important papers, coins, two-dollar bills, and other cash. James Adams’s pickup truck was also missing.
Defendant is the victims’ son. At the time of the victims’ deaths, the relationship between defendant and his mother, Catherine Adams, had deteriorated because of his relationship with his girlfriend, Angela Swaggerty, of whom his mother disapproved. His mother had previously advised defendant and others that she would remove him from her will and had an appointment with her attorney to change the will on Monday, September 22, 1997.
On September 21, 1997, between 8:00 p.m. and 9:00 p.m., Donna McLeod accompanied her friend Angela Swaggerty to pick up defendant in front of the Hill— Behan lumber yard. After defendant got into the car, Ms. Swaggerty asked him what had happened. Defendant replied, “They’re dead, they’re both dead[.]” He stated that he had dressed in dark clothing, wearing a mask, and had confronted his father, James Adams. Defendant described his mother identifying his voice and his father then telling him, “[y]ou’d better kill me now, because if not you’re going to spend the rest of your life in jail.” Defendant stated that he also had to kill his mother, Catherine Adams, because she had recognized his voice. Defendant indicated he had shot one of the victims, but, after his gun jammed, he also used the butt of a shotgun and a knife from the kitchen on the victims.
Ms. Swaggerty drove behind an old Winn-Dixie store, where the defendant retrieved a garbage bag and a pair of tennis shoe boots. Defendant returned to the car, and Swaggerty drove around to a truck parked on the side of the building. Defendant then got out and wiped down the steering wheel, dashboard, and door of the truck. The three then went to Ms. McLeod’s camper.
I ¿At the camper, defendant changed into some clothes from the car, and Ms. Swag-gerty examined the contents of the garbage bag, which contained various papei’s, envelopes, a butter bowl of coins, a pack of two-dollar bills, and approximately $780.00 in other cash. Ms. McLeod observed defendant with a dark knit mask and a gun. The papers were returned to the garbage bag, but defendant and Ms. Swaggerty left the butter bowl change and the two-dollar bills in the camper.
*631 The three then went to the Waffle House restaurant. Either defendant or Ms. Swaggerty placed the garbage bag in the trunk of Ms. McLeod’s wrecked car located in the restaurant’s parking lot. After they had been in the restaurant for less than a half hour, Ms. Swaggerty stated they needed to leave in order to be home before the telephone call came regarding the victims. The next day, Monday, September 22, 1997, Ms. McLeod met Ms. Swaggerty and defendant at the Waffle House. Ms. Swaggerty advised her, “tj]ust to be cool.”
On Tuesday, September 23, 1997, Ms. Swaggerty instructed Ms. McLeod that she would telephone Ms. McLeod to tell her when to “bring the gift [the garbage bag in the wrecked car’s trunk]” to her at defendant’s house. Ms. Swaggerty accordingly contacted Ms. McLeod as planned on Wednesday, September 24, 1997, and advised her to “bring the gift” to her. After McLeod arrived at defendant’s house with the garbage bag, defendant loaded a shovel into the car and Ms. McLeod drove the car to the Delchamps shopping center. Ms. Swaggerty and defendant then drove to the same location and parked their car there, having previously explained that they had not wanted to be seen leaving their home with Ms. McLeod. They then had Ms. McLeod drive them in her car to a piece of property near Pearl River that they were trying to purchase. There, defendant buried the garbage |fibag and another bag and discarded the shovel. They then returned to the Delchamps shopping center, where Ms. McLeod dropped off defendant and Ms. Swaggerty.
The three met another day at the Waffle House restaurant. Ms. McLeod had in the interim met with law enforcement authorities, a fact unknown to defendant and Ms. Swaggerty. She told Swaggerty that she had to be at the police station at 9:00 a.m. that morning for questioning. Ms. Swag-gerty and defendant advised McLeod, “[j]ust stay cool, stay calm, you’re the only one that could blow it, there’s no evidence, they can’t find nothing[.]”
James Adams’s truck was recovered near the Winn-Dixie supermarket. Blood and hair were recovered from the driver’s side interior of the vehicle. A DNA profile of the blood was consistent with that of Catherine Adams. The genetic profile of the blood found in the truck would have a frequency of occurrence in the Caucasian race of one in 4.35 million persons.
A subsequent search of the property near Pearl River uncovered a jammed Raven .25 caliber semi-automatic pistol buried in a hole, along with five prescription medicine bottles bearing Catherine Adams’s name, tennis shoes, and papers and bills belonging to the victims. Both the pistol and the shoes had blood on them. Ballistics tests confirmed that the weapon fired a bullet and cartridge case recovered from the crime scene. The left tennis shoe had the same class characteristics as the shoe that left a footprint at the crime scene. The pistol had been purchased by defendant on February 17,1995, but had not been reported stolen. The two-dollar bills and the butter bowl were recovered from Ms. McLeod’s camper.
| (¡Defendant testified at trial and denied killing the victims. He claimed that Ms. McLeod and Ms. Swaggerty picked him up from the side of the road on the night of the killings and drove him to Ms. McLeod's camper. He further claimed that once they arrived at the camper, he stayed in the car while Ms. McLeod and Ms. Swaggerty went into the camper with a garbage bag they had retrieved from the trunk of the car they had driven to the camper. He claimed Ms. McLeod had testified falsely about him.
*632 HEARSAY
In his first assignment of error, defendant contends the trial court committed error and abused its discretion in admitting prejudicial testimony regarding his parents’ supposed plan to change their wills. The defendant claims hearsay testimony from Wanda Cheryl Adams, Karen Adams Hover Wilcox, and Thomas A. Lus-sen, Jr. should have been excluded at trial.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay is not admissible except as otherwise provided by the Louisiana Code of Evidence or other legislation. La. C.E. art. 802.
La. Code Evid. art. 803 in pertinent part provides:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
[[Image here]]
(3) Then existing mental, emotional, or physical condition. A statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant’s then existing condition or his future action. A statement of memory or belief, however, is not admissible to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant’s testament.
|7The State presented testimony at trial from Wanda Cheryl Adams, the victims’ daughter and defendant’s sister, regarding telephone conversations she had with defendant soon after the killings. ■ On cross-examination, the defense, inquired whether Wanda Adams was aware that her mother and her sisters had become more 'and more concerned about defendant’s relationship with Angela Swaggerty. The court sustained the State’s objection to the question on grounds the same called for speculation because Wanda Adams was not living in Louisiana at the time in question. The defense then asked Wanda Adams if her mother had ever expressed any such concerns, and she answered affirmatively. The State’s late hearsay objection to the question was overruled because of the victim’s status as “unavailable.” The.defense then asked Wanda Adams if she was aware that the concerns escalated, and she answered affirmatively. The defense asked Wanda Adams if she was aware that defendant would not listen to his mother, and she answered affirmatively. The defense asked Wanda Adams if she was aware that defendant was apparently very much in love with Ms. Swaggerty, and she answered affirmatively.
On redirect examination, the State asked Wanda Adams if the situation between her mother and defendant included her mother being very disappointed, very upset, and at times angry with the choices defendant was making, and she responded affirmatively. The State asked Wanda Adams if, based on those feelings, her mother, on more than one occasion, had told the defendant that she and her husband intended to remove the defendant from their wills. Wanda Adams answered affirmatively. The State followed up that response by asking, “That he would not inherit anything?[,]” and only then did the defense object, arguing the question was leading, called for hearsay, and was beyond the scope of cross-examination. The court ^sustained the objection as to the question being leading. The State rephrased its question, asking Wanda Adams what her mother had said in regard to the defendant’s presence or absence in the will concerning his inherit *633 ing anything. The defense objected again, arguing the question called for hearsay. The State responded that its previous hearsay objection to the conversation had been overruled, and the trial court agreed with that point because the witness was unavailable. The defense renewed its objection to the question as calling for hearsay, if Wanda Adams did not have personal knowledge or was not part of the conversation with her mother. The State accordingly asked Wanda Adams if she had heard her mother talk about the defendant’s presence or absence in the will in regard to inheriting anything, and she answered affirmatively. In response to further State questioning, Wanda Adams testified that, in a telephone conversation with her mother on the Thursday before her death, her mother stated she was going to take the defendant “off the will,” and was going to substitute the defendant’s sons as heirs “in his placet.]” She also testified that her mother stated, “[wjouldn’t that just piss him off?” and emphasized her intention to make the changes “right now.” According to the witness, her mother stated that she planned to make the changes to her will the following Monday morning.
On recross examination, the defense asked Wanda Adams if she had any knowledge as to whether defendant was aware of the planned changes to the will. The trial court ruled that if Wanda Adams could not testify whether or not her mother had specifically informed her that she had communicated her intent regarding the will to defendant, then the information would be hearsay. The witness replied she did not know and could not recall if her mother had advised her that she had so informed defendant.
| flWanda Adams’s testimony concerning her mother’s statements to her in their telephone conversation was admissible under La. C.E. art. 803(3). Those statements related to Catherine Adams’s then-existing state of mind and were offered to prove her intent to remove the defendant as an heir from her will. This was a fact at issue in the case because it was the State’s theory that defendant’s motive in killing the victims was to prevent them from removing him from their testaments. Further, we conclude that the probative value of the statements was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or waste of time. See La. C.E. art. 403.
The State also presented testimony at trial from Karen Wilcox, the daughter who discovered the victims’ bodies. Under direct examination by the State, she testified that on the Friday before the killings, she heard her mother speaking with defendant on the telephone and advising him that “she was going to sign the papers Monday, that she was changing her will.”
Thomas A. Lussen, Jr. was called as a witness by the State. Mr. Lussen was the victims’ attorney and prepared their testaments. He testified that Catherine Adams contacted him on Friday, September 19, 1997, and wanted to make an appointment to change her testament as soon as possible. He therefore scheduled an appointment for Catherine Adams for the following Monday morning.
Defendant failed to contemporaneously object to the alleged hearsay statements contained in the testimony of Ms. Wilcox and Mr. Lussen. Accordingly, review of the admissibility of those statements is precluded. La.C.Cr.P. art. 841(A); see also La. C.E. art. 103(A)(1) and State v. Wessinger, 98-1234, p. 16 (La.5/28/99), 736 So.2d 162, 178, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999) [superseded on other *634 Imgrounds by amendment of La.C.Cr.P. art. 905.2(A).] Further, the statements in Ms. Wilcox’s testimony, which did not reference defendant’s past or future aggressive actions, defendant’s culpability, or the dispositive issue in the case, clearly had probative value because of the testimony that Catherine Adams had told defendant that she and her husband intended to remove him from their wills. See State v. Brown, 562 So.2d 868, 877-80 (La.1990).[1] This assignment of error is without merit.
POST-CONVICTION RELIEF DELAY ADVICE
In his second assignment of error, defendant contends the trial court failed to properly advise him of the delay for applying for post-conviction relief. The State concedes that defendant was not properly advised of the delay.
At the time of sentencing, the trial court must inform the defendant of the prescriptive period to seek post-conviction relief in La.C.Cr.P. art. 930.8(A). See La.C.Cr.P. art. 930.8(C). However, the trial court’s failure to properly advise defendant of that delay has no bearing on his sentence and is not grounds to reverse the sentence or remand the case for resentencing. Instead, we hereby remand the case solely to direct the trial court to provide the defendant, within ten (10) days of the rendition of this opinion, written | ^notice of the correct prescriptive period for applying for post-conviction relief, and to file written proof of his receipt of such notice in the record of the proceedings. See State v. Vince, 98-1892, p. 7 (La.App. 1st Cir.6/25/99), 739 So.2d 308, 312, writ denied, 99-2232 (La.1/28/00), 753 So.2d 230.
We accordingly affirm the convictions and sentences.
CONVICTIONS AND SENTENCES AFFIRMED; CASE REMANDED FOR THE LIMITED PURPOSE OF THE TRIAL COURT PROVIDING WRITTEN NOTICE TO DEFENDANT OF THE DELAY FOR SEEKING POST-CONVICTION RELIEF WITHIN TEN (10) DAYS OF THIS OPINION, WITH WRITTEN PROOF OF RECEIPT OF NOTICE FILED IN THE RECORD.

. State v. Doze, 384 So.2d 351 (La.1980), and State v. Weedon, 342 So.2d 642 (La.1977), are distinguishable from the instant case. In Doze, there was no evidence the victim’s intention to evict the defendant was communicated to the defendant ("hearsay evidence of a victim's declaration of intention may not be introduced to prove a defendant’s motive, when there is no evidence to show that the victim’s intention was actually communicated to the defendant.”) Doze, 384 So.2d at 354. Similarly, in Weedon, there was no evidence ■ (in fact, evidence to the contrary) that the defendant knew the victim intended to leave him ("The fact that die wife intended to leave her husband is irrelevant, unless her husband knew of her intention. If the wife had told her friend she intended to tell her husband of her intention to leave him the following morning, her out-of-court declaration might have been admissible under [State v.] Raymond[,] [258 La. 1, 245 So.2d 335, cert. denied, 404 U.S. 805, 92 S.Ct. 101, 30 L.Ed.2d 38 (1971)] as tending to show immediately antecedent circumstances explanatory of the killing.”) Weedon, 342 So.2d at 647.